(125 So. 258)

No. 29443.

**YOUNG v. BARELLI et al.**

Oct. 8, 1929.   Rehearing Denied Dec. 2, 1929.

Miller & Heintz, of Covington, for appellant Barelli.

Edward Rightor and Eugie V. Parham, both of New Orleans, for appellant American Employers' Ins. Co.

Lewis L. Morgan, of New Orleans, and J. Monroe Simmons, of Covington, for appellees.

ROGERS, J. This is a concursus proceeding growing out of the construction in the town of Covington of a large brick building to be used as a sanatorium for the treatment of mental and nervous diseases. The owner and contractee impleaded the contractor, the surety on his bond, and four alleged lienors. Plaintiff's demand against the contractor and his surety was for $8,900, the estimated cost of alleged defective work; and his demand against the lienors was for the cancellation of their liens and a limitation of his liability to $617.26, the amount of the balance due by him on the contract, which he deposited in the registry of the court.

The contractor and his surety denied that the work was defective, and averred that the contractor had performed all work on the building that he was called upon or obligated to do. The contractor claimed $3,725.37, by way of reconvention, for extra work and time lost.

Judgment was rendered by the court below in favor of plaintiff against the contractor and his surety, in solido, for the sum of $8,709, with interest, and for an additional amount of $1,000 as attorney's fees. Also in favor of two of the lienors—C. W. Alexius for $1,070, with interest, and Gibbens & Gordon, Inc., for $257.38, with interest—against the contractor's surety. The reconventional demand of the contractor was rejected at his cost. From this judgment the contractor and his surety are prosecuting the present appeal.

■ The claim of C. W. Alexius, on which he obtained judgment against the American Employers' Insurance Company, the surety on the contractor's bond, for $1,070, was for money lent the contractor partly to pay his workmen and partly to use generally. In neither case, however, is the contractor's surety responsible for the debt.

The contract between the parties is governed by Act No. 139 of 1922, as amended by Act No. 230 of 1924, both of which statutes have since been repealed by Act No. 298 of 1926. No question is made of the subrogation of the claimant to the claims of the laborers for the payment of whom he advanced the money to the contractor. Neither of the controlling statutes grants a privilege to the furnisher of money used in paying the laborers therein referred to. Central Lumber Co. v. Schroeder, 164 La. 759, 114 So. 644. Nor is the claim asserted by the claimant one of those covered by the bond, which is statutory, conditioned for the payment only of the subcontractors, journeymen, cartmen, truckmen, workmen, laborers, mechanics, and furnishers of material jointly as their interest may arise. Section 2, Act. No. 139 of 1922.

■ The only item of the claim of Gibbens & Gordon, Inc., that is disputed by the appellant surety company is one of $27 for ventilators. These ventilators, 18 in number, were placed in the walls of the foundation of the building. They were not provided for in the original building contract, but were ordered by the architect at the suggestion of the contractor after he had noticed a bulge in the floor of the main entrance hall. The bulge in the floor was caused by the dampness under the building, and the ventilators were purchased and placed to remedy the condition.

While the ventilators were not specified in the contract nor ordered by the contractor, they were, nevertheless, used by him in the construction of the building. Furthermore, he considered and claimed that he was entitled to be compensated as extra work for furnish-

ing ($27) and setting ($2.75) the ventilators. Vide, item No. 19 of the reconventional demand. And under a written agreement entered into on May 31, 1926, between the owner and the contractor, approved by the representative of the surety company, which agreement is herein attacked by the contractor, in consideration of the cancellation by the owner of all claims for credits and demurrage, the contractor waived all his claims for extra work. Thus, both the contractor and his surety expressly recognized that the former was entitled to be compensated for extra work, including, necessarily, the furnishing and setting of the ventilators, and the fact that they chose to waive this claim, among others, against the owner for such work, cannot relieve them of the obligation of paying for the ventilators. The court below was correct in allowing the claim of Gibbens & Gordon, Inc., in full.

The demand of the owner for a large moneyed judgment against the contractor and his surety was vigorously contested in the court below. On the trial of that issue much testimony, oral and documentary, was adduced on behalf of the parties litigant. Among the written evidence offered on behalf of the owner is a list prepared by the architect setting forth the items of alleged defective and uncompleted work. The items are numbered from 1 to 36, but there are no defects nor uncompleted work listed under the numbers 28 and 29, so that actually there are 34 items in dispute.

The owner employed two experts to examine the building and estimate the cost of remedying the alleged defects and completing the work. The contractor and his surety employed one expert for the same purpose. The three experts testified on behalf of their respective employers, and their estimates of the cost of remedying the defects differ so widely that there is no possibility of reconciling them. The court must therefore accept as correct either the estimates of the owner's experts or the estimate of the expert for the contractor and his surety. Witnesses are not counted but weighed. In determining the value of this testimony as proof of the facts, the mere circumstance that two experts were introduced by plaintiff and only one expert was introduced by defendants is not controlling. Conceding the truthfulness of the witnesses, there are many other factors to be considered in determining their competency to judge of the matters about which they testified. Among these factors may be mentioned, by way of illustration, their general intelligence, their scientific education, their practical experience, and their manner and means of observation.

One of plaintiff's witnesses (Wikle) has been in the contracting business for 21 years, of which 3 years were on his own account. Plaintiff's other witness (Burkes) has been in the contracting business for 27 years, of which 20 years were on his own account. He was assisted in making his estimate by one of his employees (McFadden), a civil engineer and estimator, with 3 years' experience, of building construction. The defendants' witness (Neville) is professionally a civil and construction engineer, holding two degrees as such from Cornell University, from which institution of learning he was graduated in 1899 and 1900. He also served for short periods as instructor of construction engineering at Cornell University and at the University of Iowa. In addition to his collegiate training and teaching experience, the witness has been engaged in construction work, both as a contractor for his own account, and as an estimator for other contractors. At the present time he confines his business solely to that of construction engineering, making estimates

on a fee or commission basis for some of the prominent contractors and important commercial firms of the city of New Orleans.

The record discloses that plaintiff's experts were together when they made their examination of the building. The examination was made on December 16, 1926, and about 12 hours were consumed in the work; plaintiff being present during the entire period. No preparation was made, apparently, by the experts prior to their visit to plaintiff's building. They made their examination and estimates as they went along solely from the list of 34 alleged defects that had been prepared by the architect, consulting, perhaps, from time to time, the plans, but not the specifications, for the building. Defendant's expert spent only about 4 hours on May 3, 1927, in his examination of the work. But prior to his visit to the plaintiff's building he had made a thorough study of the architect's plans, specifications, and list of 34 alleged defects which were in his possession for a period of 10 days for that purpose. When he visited plaintiff's building he knew exactly what alleged defective work was in dispute and where to look for it. His examination was made in the presence of the contractor and for a part of the time, at least, in the presence of the plaintiff. In these circumstances, it appears to us that the examination and estimate of defendants' expert is more nearly correct than the examination and estimate of plaintiff's experts. Our conclusion in this respect is fortified by the testimony of the experts on the individual items of alleged defects, as we will point out later, in our discussion of those items, and by other outstanding facts appearing in the record.

Burkes, in his estimate dated August 30, 1927, 8½ months after his examination of the building, placed the cost of remedying the alleged defects at $8,939.32. Wikle, whose estimate is dated January 17, 1927, about 30 days after his examination of the building, placed the cost of remedying the alleged defects at $7,705.20. Neville, on the other hand, showed in his testimony that the cost of repairing all the defects that his examination disclosed, including those for which he thought the contractor was not responsible, would be approximately $562.62.

In the consideration of the estimates furnished by plaintiff's witnesses, the first impression made upon the mind of the court is the relatively high proportion they bear to the entire contract price of $45,053. Burkes's estimate is practically one-fifth, and Wikle's estimate is practically one-sixth, of this amount. The court is unable to conceive how a contractor of the experience of the defendant contractor could have erected under architectonic supervision a building which he contends is complete, in which the owner is living and operating his hospital, that is so defective as to require an expenditure of at least one-sixth of its entire original cost to complete it according to the building contract. Moreover, the liberal character of the estimates made by plaintiff's witnesses is indicated by the inclusion in one of them (Burkes's) of the following items, viz.: "Job Overhead, Insurance-Travel, $465.00; Office Overhead 5%, $363.78; Bond Premium, $134.00; Commission 15%, $1,166.00." The other estimate (Wikle's) appears to be exclusive of office and supervising charges.

Under date of May 14, 1926, the architect, after an inspection of the building, addressed a letter to the contractor calling his attention to nine items of alleged defects in the work and requesting him to give the matter the necessary attention. On May 26, 1926, 12 days later, after another inspection of the building, the architect again wrote the contractor calling his attention to 17 items of alleged de-

fects, including some of the defects referred to in his previous letter.

On May 31, 1926, the owner and the contractor, with the approval of the representative of the surety company indorsed thereon, entered into the written agreement hereinbefore referred to. In this agreement the owner canceled his claim for credits and demurrage and the contractor canceled his claim for extra work. The contractor further agreed to complete the items of work listed in the letters of the architect to the contractor dated May 14, 1926, and May 20, 1926. The latter date is apparently an error, and the reference is intended to cover the letter of May 26, 1926, referred to supra. Coincidentally with the execution of the agreement the owner moved into the building and began operating it as a sanatorium.

It appears to us highly improbable that the plaintiff would have moved into the building and conducted his business therein, amounting, practically, to an acceptance of the work, if it was as defective as he now claims it to be. And it is all the more incredible that the contractor and the representative of the surety company should have voluntarily agreed that the former would repair certain defective work if that work was as extensive and costly as plaintiff sets forth in his petition herein. On this phase of the case, the testimony of the representative of the surety company and of the contractor is that the architect, who was present when the agreement was executed, stated in answer to the direct question of the former that the cost of repairing the defective work would be about $500. The plaintiff and his son Dr. Laurie Young, who was also present at the signing of the agreement, testified that they never heard the architect make the statement attributed to him. Their testimony, however, is only negative in character. The architect, himself,

would not deny making the statement, declaring merely, when questioned in regard thereto, that he had no recollection of having made it. It was natural for the representative of the surety company in obligating his principal to desire some expression from the architect, who was pointing out the alleged defects, as to the probable cost of remedying those defects. Our own conclusion is that the statement was made as testified to by the witnesses hereinbefore referred to. In this connection it is significant to note the approximation between the figure of the architect of $500 and the figure of defendants' expert Neville of $562.62.

The record shows that subsequent to the agreement of May 31, 1926, employees of the contractor worked on the building with a view of correcting its defects. This work was wholly of a minor character, consisting of the readjustment of the gratings in some of the windows, regearing transoms, constructing and placing two small screens at the opening for the coal chute in the basement, repairing locks on doors and windows, and re-weighting a few window sashes. The workmen testified that they repaired all the defects that were pointed out to them by plaintiff and his sons, who, upon the completion of the repairs, expressed their satisfaction therewith and stated nothing further was to be done. On July 28, 1926, which was about two months posterior to the execution of the agreement of May 31, 1926, plaintiff, with the approval of the architect, paid the contractor $496.55. On August 17, 1926, plaintiff paid the contractor a further and larger amount, viz.: $3,867.38. We gather from the record that plaintiff is a prudent man and of an exacting disposition. It is passing strange that, if the building which was at all times under the supervision of the architect was as defective as plaintiff would now have it

appear, plaintiff released these funds, when he could have, and as a matter of precaution should have, retained them to protect himself against the contractor's alleged breach of the contract. It is true that the payment of $3,867.38 was made for the purpose of liquidating the claim of a materialman, which was done. Nevertheless, this is hardly a satisfactory explanation of the circumstance, since, if the condition of the building was as bad as now pictured, ordinary prudence would have impelled plaintiff to withhold the payment, relegating the materialman to an action on the surety's bond, rather than assuming that burden himself.

The architect, in the early part of January, 1927, made another inspection of the building. About two weeks thereafter he furnished plaintiff with a list of 34 alleged defects in the work. Plaintiff sent the list to the contractor and demanded that the defects enumerated thereon be corrected. The contractor ignored his demand, and on May 4, 1927, plaintiff brought this suit to enforce it.

Pretermitting any further discussion, generally, of the controversy between the parties litigant, we shall now take up and discuss in their regular order the items of alleged defective work.

■ 1. "Interior of brick wall improperly damp-proofed in many places along base board of first floor.

"Plastering should be removed to brickwork proper; brickwork thoroughly cleaned, damp-proofed and plastered in accordance with specifications, in order to cover the spots caused by inseeping dampness."

The specifications originally provided for a damp course which, from motives of economy or otherwise, was expressly omitted from the contract by the architects' bulletin No. 2, page 2. The record shows that a damp course consisting of a double layer of slate placed in the walls below the first floor joists is usual and necessary in a building of the size and character of plaintiff's building in order to prevent dampness from the ground penetrating the walls. Neville, defendants' expert, explained the difference between a damp course and a waterproofing course, which is applied all over the walls. He testified that the dampness complained of was due solely to the lack of a damp course, because the dampness occurred along the baseboard only and not over the entire surface of the walls, which would have been the case in the absence of a waterproofing course. His opinion was that the contractor was not responsible for the alleged defect. Defendants offered testimony to show that a waterproofing compound was placed on the brick walls. Plaintiff's experts apparently made no attempt to ascertain the cause of the alleged defect, accepting as correct the notation thereof on the architect's list furnished them. In these circumstances, we would be inclined to relieve the defendants from any responsibility for this work were it not for the fact that, in the agreement of May 31, 1926, referred to supra, the contractor, with the approval of the representative of the surety company, expressly agreed to "repair the waterproofing of the basement."

Wikle, for plaintiff, estimated the cost of the repairs at $142.50. Burkes, for plaintiff, fixed the cost of the work at $146. Both of these estimates were pure guesses on the part of the estimators, neither of whom knew how many yards or feet of plaster would have to be removed and replaced. The witnesses merely looked at the alleged defective work, and from their past experiences came to their conclusions of what it would cost to repair it. Neville, for defendants, had the necessary measurements made by the contractor in his

presence. Using these measurements as a basis and figuring on the highest wages paid in New Orleans on this class of work for a brickmason and helper and a time limit for doing the work, Neville estimated that the repairs would cost $45. We think his figure is more apt to be correct than the figures of plaintiff's witnesses and adopt it as the measure of the defendants' liability on this particular item.

2. "Plastering is cracked in many places throughout building, should be properly pointed and all loose plaster removed."

On this item, Wikle's estimate was $525.30, and Burkes's estimate was $425, the difference being $100.30. Neither of the witnesses knew how many yards of the material would have to be torn out and replaced. Their estimates were predicated solely on their experiences in the contracting business. Neville's estimate was $30. His figure was based on actual measurements taken by the contractor and checked by the witness.

There is some room for doubt, according to the record, concerning the liability of the contractor for this item. Nevertheless, the defect being conceded, the burden of proof is on him to show that it is not due to any fault on his part. We are unable to hold that he has satisfactorily discharged that burden. He must, therefore, be cast for the cost of this repair which we fix at $30.

3. "All pointed and new plaster; and all plaster mentioned in paragraph 1 should be refinished with same quality of paint and in color to match the adjoining work."

The painting required under this item is a necessary consequence of the removing and replacing of the plaster referred to in the two previous items. It appears that painting plaster is referred to, also, under items Nos. 18 and 33. On this particular item, however, Wikle's figure is $220. Burkes thinks it will

cost $381 to do the work. The difference between plaintiff's experts on the item is $161. As in the case of the previous items the witnesses based their estimates on experience and not on measurements. Neville, for defendants, testified the repairs ought not to cost more than $60. He gives in detail the facts on which his estimate is based. We fix $60 as the amount of defendants' liability on this item.

4. "Wire lathing omitted at intersections of stud partition and brick work of heater flue."

The estimates of the experts covering this item are as follows, viz.: Wikle, $13; Burkes, $12; Neville, $10. The latter testified, however, that neither the specifications nor the plans required the use of wire lathing. The contractor, also, testified to the same effect. A reference to the documents bears out their testimony. No responsibility rests upon the contractor for this item.

5. "Many sashes have improper weights."

Wikle says it will cost $9.70 to remedy this defect. Burkes estimated the cost at $66, a difference between plaintiff's experts on this small item of $56.30. Neville testified that $6 would be the proper amount to allow for this item. We think this is correct.

6. "Door closers of screen doors and of certain outside doors requiring adjusting. Certain screen doors do not operate because of improper fit."

The record shows that the first door closers adjusted by the contractor were considered to be too strong, and were taken off and delivered to the architect who carried them to New Orleans. In lieu of these door closers the architect furnished others of an inferior character which were used. Four door closers need adjustment. The cost of doing this is estimated at $9.50 by Wikle and at $12 by

Burkes. Neville declared that a carpenter can get to and from the building and adjust the four door closers in less than four hours. He testified that $4 would be a reasonable charge for the work. We think this is a fair estimate of the contractor's liability on this item.

■ 7. "Point brick work around jambs of second story windows and in the gable of main building."

Wikle's estimate was $49 and Burkes's estimate was $42 for this item. Neither was able to state at the time of testifying how many windows he figured on. Neville testified that as a result of his examination he found one window only in need of pointing. In order to be on the safe side, however, he figured that a workman could go over all the windows in 6 or 7 hours at a cost of $6 for labor and $2 for material. We find the contractor should be charged $8 for the repair of these defects.

■ 8. "Certificate of inspection from official having jurisdiction over electrical work in St. Tammany Parish has not been obtained."

Wikle did not furnish any figure on this item. Burkes thought it would cost $15 to obtain the required certificate. The testimony shows that there is no official within the town or parish vested with jurisdiction over electrical work. Hence the charge is wholly unfounded and must be disallowed.

■ 9. "Interior finish throughout building does not fit tightly against plaster. This does not imply interior finish in such parts as the plaster is not perfectly aligned, as such defects are predicated on improper plastering and not on improper joinery. Remove all picture molding and chair rail, which cannot be made to finish properly against the plastering, or that are physically defective or improperly installed. This does not mean the removal

of all chair rail and all picture molding throughout the building where only secondary imperfections are apparent."

Wikle's estimate was $525.20 for this item. Burkes's estimate was $450. Neither knew on how many lineal feet his estimate was based. Nor could either of these witnesses say how much of his estimate covered the picture molding and how much of it covered the chair rail.

The contractor testified that both the chair rail and the picture molding fitted tightly against the plaster when he left the work. He also testified that when he made his examination in company with Neville he did not see anything wrong with the picture molding and chair rail. He pointed out that the cost would not be anything like the estimates of Wikle and Burkes if all the picture molding and chair rail in the building were taken down and put back again. He stated that the cost runs about 3 cents per foot for both picture molding and chair rail, and that practically all of the material that had been used could be reused in the event it became necessary to do the work over again.

Neville correctly showed that the item contemplates the repairing only of a limited amount of picture molding and chair rail. He testified that he examined the work complained of very carefully and found one spot only where the molding needed to be taken off and replaced and a few spots where the molding was a little loose and required tightening; that it was a small item, which a carpenter could easily correct within three hours. His estimate of the expense of doing the work required under this item is $3. In answer to a question, the witness declared that the estimates of Wikle and Burkes were wholly out of line; that $450, the lowest of the two estimates, is about three times what it ought to cost if every foot of the work had to be done

over. The witness figured every foot of picture molding and chair rail in the building, showing for both, in round numbers, 3,000 lineal feet. The cost of the molding at the factory is 2 cents per running foot, and the witness declared that it could not possibly cost more than 5 cents per running foot, say $150, to place it on the walls. We have no reason to doubt these figures, which, so far as we have been able to ascertain, stand uncontradicted. The estimates of plaintiff's witnesses appear to be so wholly at variance with the facts that we must dismiss them from all consideration. On the other hand, it may be that defendants' expert has underestimated, to some extent, the cost of making the repairs called for by this item, but his estimate is the only guide the record affords us for our decision. We must, therefore, accept it as being approximately correct and hold that defendants are due plaintiff $3 on this item.

■ 10. "Many doors have shrunken to an extent beyond use. Other doors are mutilated and should be properly dressed. This does not include doors with slight defects, which it is not proposed to alter in any manner."

Wikle testified that he did not know how many doors were in the building, but that he figured approximately 35 doors needed correction. His estimate for doing the work was $260. He was unable to state offhand how many of the doors required redressing or at what he figured on each door individually. Burkes, at the time of testifying, did not remember the number of doors he had figured on as needing attention. His estimate was $408, or $148 higher than that of plaintiff's other expert.

The evidence shows that before the doors were placed in position they were kept for two months in a storeroom alongside the building and were inspected and approved by the architect. The contractor testified that at the time of his examination of the doors with Neville he saw no evidences of mutilation, and the only defect he observed was in a panel of one door which showed a little mill run. Neville stated that the building contained 78 doors; that, if the defects complained of ever existed, they had been remedied prior to his examination of the building; that the only defect he found was in the panel of one of the doors which should be taken out, redressed, and replaced. His estimate of the cost of doing this was $6.50, which is the amount we hold plaintiff is entitled to recover on this item of his claim.

■ 11. "Many door frames have shrunken to the extent as to leave a void between the finished floor and the plinth block. This condition is not so apparent in the side jambs of these openings, and it is not proposed to change the jambs, except where this condition is apparent."

Wikle's estimate was $395, and Burkes's estimate was $360 for this item. Neither of the witnesses was able to state at the time he testified how many doors were in the condition set forth in the item. The evidence shows that the plinth blocks were made of dry, well-seasoned cypress, and that the door frames were made of No. 1 common pine, as called for by the specifications. They were made on the scene of building operations, and before being used were inspected and approved by the architect. Neville testified that the doors were made of proper material and were properly installed; that in a few places there was a slight shrinkage due to the overheating of the building; that it would not take a carpenter a day to go over the doors and correct the conditions he found. He fixed the cost of doing this at $8. We accept this figure as the measure of defendants' liability in the premises.

12. "Three-corner beads have been omitted."

This is a small item, for which we do not find any responsibility resting upon the contractor. The record shows that the specifications called for metal corner beads, which were ordered out by the contractor. Later, the owner and the architect changed the plans necessitating the use of two more corner beads than the contractor had on hand. Upon this condition of affairs being explained to the architect, he directed the contractor to make and use wooden corner beads in the lieu of metal corner beads, which was done.

13. "Clean glass throughout building."

The evidence shows that at the time of the inspection of the building by Neville and the contractor all the glass in the building was clean. Hence, this item of plaintiff's claim must be rejected.

14. "Dress off high spots in floors throughout building."

The contractor testified that the floors had been gone over with an electric sanding machine and were smooth and in good condition when he left the work. Wikle's estimate was $158, and Burkes's estimate was $98 on this item. Neville testified that the floor had come up in a few places, and there were also some high spots in it. He counted the spots and figured that they could be covered by one man working four days at a cost of $32. This did not include the buckle in the floor of the hall which was the subject of another item on the architect's list. We think defendants should be charged with $32 on this portion of plaintiff's demand.

15. "Readjust control valves in order to make a workmanlike job."

16. "Raise hot water tank and leave same free of pavement, providing steel plate thereunder."

17. "Stop all leaks in plumbing and heating and make said system thoroughly tight."

These three items refer to the heating and plumbing systems installed in plaintiff's building. Wikle and Burkes, plaintiff's experts, make no pretensions of any personal knowledge concerning them. Their figures are based solely on the figures of one A. S. Chevis, whom plaintiff called upon to furnish an estimate in connection with these alleged defects. Chevis submitted an estimate of $1,554.04 for remedying them. Wikle accepted this figure, omitting the odd cents. His estimate was $1,-554. Burkes raised the amount fixed by Chevis to $2,315.52; his estimate carrying the change of sections on radiators called for in item No. 36 and including, also, a contractor's commission.

The testimony shows that the heating and plumbing systems were installed in plaintiff's building in accordance with the plans and specifications. The sole exception was in regard to the control valves for the hot and cold water system which the specifications provided should be placed in the attic. The attic proved to be inaccessible, and, upon the architect's attention being called to that fact, he ordered the valves to be relocated in the various rooms. After it was completed the entire system was thoroughly and satisfactorily inspected and tested by the architect and the owner's engineer. In view of these circumstances, we are at a loss to understand how the system could have collapsed to the extent indicated by the estimate of Chevis. The estimator, himself, was not able to furnish any details in support of his estimate. His testimony was that he arrived at the estimate from his experience and knowledge of that kind of work, and that it covered, generally, leaking joints, undersized and improperly installed piping and leaking fixtures.

Neville, on behalf of the defendants testi-

fied that the control valves were installed, but that the control valve wheels had been removed, and that it would cost about $28 to replace them; that no provision was made in the specifications for any steel plate under the hot water tank; that when he made his inspection there were no leaks and no evidence of any leaks. For these reasons, he did not furnish any estimates in connection with items Nos. 16 and 17.

The evidence in the record shows to our satisfaction that the heating and plumbing systems were properly installed in plaintiff's building; that the hot water tank was placed in the right spot; that it could not be set upon pipe standards because it was too tall and would hit the ceiling, leaving no room for the necessary piping; that a steel plate under the tank was not required by the specifications. We are also satisfied that all the pipes were given the proper fall; that the dampness appearing at various times at various spots in the walls was not caused by the leaking but by the sweating of the pipes, due mainly, if not wholly, to the fact of installing, under the specifications, a 3-inch pipe, actually $3\frac{5}{8}$ inch on the exterior, in a 4 inch wall, causing the pipe to come into contact with the plaster, and causing the plaster to absorb moisture therefrom, resulting in the appearance of some damp spots.

Our conclusion is, that the defendants are not liable for the alleged defects listed under items Nos. 16 and 17. On item No. 15 we think they are liable for $28, the amount required to replace the control valves. The testimony shows that these valves are missing. It was the contractor's duty to install the valves or to satisfactorily account for their absence. We do not think he has done either. Hence, he ought to pay for the missing parts.

18. "All plaster work stained by leaky pipes shall be pointed and refinished to match adjoining walls."

The defendants are not responsible for this claim of the plaintiffs. As we have shown in our discussion of the three preceding items the stains on the plaster are not due to leaky, but to sweating, pipes.

19. "Allow credit for the present sash cord and that specified."

Plaintiff contends that the sash cord used by the contractor was not Samson-Spot cord as provided in the specifications. The specifications, however, do not set forth the kind of sash cord to be used. The contractor wrote plaintiff a letter in which he agreed to equip the window sashes with Samson-Spot cord. He ought to be held to his agreement. The item evidently is intended to cover the difference in price between the cord actually used and the cord the contractor agreed to use. Both of plaintiff's experts estimate the difference in price to be $30. Neither, however, knew the name of the cord actually used, nor was he able to recall how many hanks of cord were required for the work. Neville testified that he had figured the amount of cord used in the job, and that it would require 20 hanks for that purpose; that the contractor had used good cord, and, figuring the difference between the highest and lowest priced cords on the market, the difference due by him would be $6. We find defendant's liability on this item to be $6.

20. "Adjust all hardware and make same operative."

Wikle testified that the work would cost $40. Burkes's estimate is exactly double that of Wikle. His figure is $80. Neither of the witnesses could remember at the time of testifying how many doors required adjusting of their hardware, nor how much per door he had figured for that purpose.

Neville declared that at the time of his inspection all the corrections had been made and the hardware was in actual use. He testified that he did not see anything that needed to be corrected, but thought that one carpenter working for one day could inspect and make all necessary adjustments if any were required. He fixed the cost of doing this at $8. We agree with his figure.

■ 21. "Remove and replace approximately 33 per cent. of window screens on account of misfit."

Wikle's estimate is $120. Burkes's estimate is $117. Neville's estimate is $20.

The evidence shows that some of the window screens do not fit; that some are too long and too light, although they are those specified in the contract. Since some of the screens do not fit, we think the responsibility is on the contractor to make them do so. Neville testified that one carpenter at $1 an hour for 20 hours could remedy all of the alleged defects which are wholly of a minor character. Our conclusion is that the defendants should pay plaintiff $20 on this item of his claim.

■ 22. "Give proper credit for omitting expansion joint in paving."

Defendants admit that plaintiff is entitled to this credit. On the testimony of the experts we fix defendants' liability on this item at $5.

■ 23. "One additional coat of paint on the underside of eaves all around the building and on the ceiling of exterior galleries."

The specifications call for three coats of paint. Wikle testified that, judging from his experience, one coat of paint had been omitted. He estimated the cost of applying this coat of paint would be $96.75. He did not know how many squares of painting were required. Burkes's estimate for the work was $70.

The painting was done originally by a sub-

contractor of 30 years' experience. He testified that, with the exception of a space about 5 feet long which could not be reached because of the removal of the scaffold, the exterior of plaintiff's building received three coats of paint. He used zinc paint in doing the work, which was according to the specifications.

Neville testified that the painting under the eaves and the ceilings of the galleries had been done according to the specifications; that zinc paint is a cheaper grade of paint than lead and oil, which is the standard paint; that zinc paint, which is thinner will cover more surface, but does not cover up as well as the standard paint; that the difference in appearance between the places complained of and the adjacent wooden columns and millwork was due to the fact that these latter had received a priming coat of paint before being placed in position. In other words, they received four coats of paint. The witness testified as to the area that would have to be covered in applying the coat of paint suggested in this item and estimated the cost of doing the work. His figure is $40. We think the defendants should be held for this, in view of the fact that the record shows affirmatively that in one spot only two coats of paint were used instead of three, as required by the specifications, and that mere patchwork at this time is more than likely to prove as unsatisfactory as the uncompleted work was originally.

■ 24. "Furnish owner with proper master keys."

The plaintiff is entitled to credit for this item. Both of his experts estimate the cost of the three keys that are required at $2 each or a total of $6. Neville stated that the plaintiff ought to be able to obtain the keys at a cost of 50 cents each, a total of $1.50. Warner, the representative of Gibbens & Gordon, Inc.,

which concern furnished the hardware for plaintiff's building, testified that the keys in question cost about 75 cents each, or $2.25 for the three keys. We accept his figure and hold the defendants liable therefor.

■ 25. "Touch up all putty; remove loose putty and point up entire glazing in a workmanlike manner."

The estimates of plaintiff's experts on this item exhibit a considerable difference. Wikle's figure is $162, and Burkes's figure is $96. Neither could tell the number nor the size of the windows, nor how much it would cost to putty each window. Neville stated that there were approximately 100 windows in the building, and that $96, the lowest estimate of plaintiff's experts, being at the rate of nearly $1 a window, was wholly out of line if all the work of puttying the windows was done anew. He declared that at the time of his inspection the putty was in first-class condition and the glazing needed no pointing. Plaintiff has failed to establish the correctness of this item by a preponderance of the evidence; hence, his claim therefor must be rejected.

■ 26. "Furnish and install two new pivoted sash in basement to match present factory work and paint same in three coats."

This item refers to the installation of a sash in the opening that was originally left for a coal chute. The evidence shows that the owner decided to use oil instead of coal as fuel, and that the coal chute, as a consequence, was never installed. The contractor equipped the opening originally intended for the coal chute with a secondhand sash. Neville testified, we think correctly, that, if the plaintiff is given credit for the coal chute, the contractor should not be charged for the window which was not specified. This credit is claimed by plaintiff and admitted by the defendants under item 34, referred to infra. His demand under this item, therefore, must be rejected.

■ 27. "Adjust all windows generally throughout building."

Wikle estimates the cost of complying with this item at $260. Burkes's estimate is $301. The latter figure, as shown by the testimony of Neville, is at the rate of $3 a window. But from our examination of the evidence we do not find that plaintiff has supported this part of his demand by a preponderance of the evidence. Hence, the demand must be rejected.

28 and 29. There are no items on the architect's list bearing these numbers.

■ 30. "Remove all screens having pine frames, replacing said pine frames with cypress frames."

Wikle's estimate is $226.50. Burkes's estimate is $261. Neither of the witnesses could recall how many screens were made of pine, although Burkes testified that the majority of them were made of that material. The testimony, however, overwhelmingly shows that, with the exception of two screens, the frames of every screen in the building is made of cypress. In the two screens in which this is not the case only the botton rails are made of pine, the sides and top rails being made of cypress. This was due to a change that was made in the size of the two windows, necessitating the remodeling of the screens. In doing this, pine, instead of cypress, was used for the bottom rails of the screens. Neville testified that in making the correction, the frames would have to be taken out and new bottom rails mortised in by hand. His estimate for doing the work, including the material, is $6. We find, accordingly, that defendants owe plaintiff $6 on this item.

■ 31. "All factory work replaced and reworked, or otherwise adjusted, shall receive the necessary painting to match the work immediately adjoining."

The estimates of plaintiff's experts on this item disclose a startling difference. Wikle's

estimate is $190.15. Burkes's estimate is $456. Neither could recall at the time of testifying how many doors and windows he contemplated repainting. Plaintiff, however, has failed to sustain this claim by a preponderance of the evidence and it must be disallowed.

32. "Repair flooring where cracks are large and unsightly in dining room, and other places where necessary."

Wikle's estimate is $702, and Burkes's estimate is $641 on this item. From our examination of the testimony we are satisfied that the defects claimed by plaintiff under this item are not nearly so serious as he asserts them to be. Neville testified that he found some cracks and buckling in the floor, which were more pronounced in the dining room and hall. He estimated that the cost of remedying the defects would be $17. But, be that as it may, our conclusion is that no responsibility whatever attaches to the contractor for the defects. The evidence affirmatively shows that the lumber used in the construction of the floors was first class in every respect. It further shows, in our opinion, that the cracks and buckling in the floors were due to a number of contributing causes. These causes are the nearness of the floor, within 14 or 15 inches, to the ground, lack of ventilation beneath the building, lack of insulation beneath the floors, and the uncovered steam pipes under the building—all of which produced a condition of heat and of dampness injuriously affecting the floor.

33. "Paint entire plaster walls where patches are made and re-plastering done to match present. (Please note that in item #3 of 'Memorandum of Uncompleted and Defective work' it was intended only to paint the pointed or patched plastering instead of complete wall surface.)"

Wikle's figure on this item was $1,692.35 and Burkes's figure was $1,820. Both of these

estimates are entirely out of reason, if the contractor was liable on this item. Neville, who carefully figured the number of yards contained in the plastered walls, shows that, if the building was new and unpainted, the entire cost of painting it inside and outside according to the specifications would be $1,528. The contractor shows that, when he was preparing his bid on the whole work, the highest bid he received from prospective subcontractors for painting the entire building, walls and all, was $1,400, and the lowest bid he received for the same work was $1,200.

As we understand this item, it is intended to cover the repainting of the walls necessitated by the repairing of the plaster called for under item No. 18. Since we do not find that the contractor is responsible for the defects listed under that item, nor for any other item of replastering except under item No. 3, for which we have made due allowance, plaintiff's demand under this item cannot be sustained.

34. "Allowance due owner for construction of coal chute."

The contractor ordered out the coal chute which he was obligated to supply under the specifications. Later, the owner decided not to use the coal chute and it was returned to the contractor. The cost of the chute was $11, and the defendants admit that plaintiff is entitled to a credit for that amount. It is so ordered.

35. "Close up present drain from refrigerator to sewer at the proper place and provide new drain from ice box to outside of building at surface of ground."

The specifications provide for the connection of the refrigerator drain with the waste line through the sewer. The evidence shows that, at the time the main line was installed, the sewer, though in the ground, was not in use, due to some litigation in which the town was involved. In this situation, the contractor and

the owner decided to run the drain pipe to the cesspool, which was done. We do not see any good reason to hold the contractor liable for not doing something that it was not possible for him to do.

36. "Change the number of sections on certain steam radiators to agree with plans and specifications."

This item is included in items Nos. 15, 16, and 17. As shown in our discussion of these items, plaintiff's claim is untenable.

Our conclusion is that, as hereinabove set forth, liability attaches to the contractor and his surety to the extent of $300.35 on 18 items of plaintiff's claim.

Under section 10 of Act No. 139 of 1922 the attorney of the owner in a concursus proceeding is entitled to a fee to be recovered against the fund deposited or against the surety. The fee under the statute must be reduced proportionately if the owner fails to recover the full amount of his claim. In the present case we think an allowance of $100 as an attorney's fee will meet the statutory requirement.

The defendant contractor complains of the refusal of the court below, upon plaintiff's objection, to permit him to offer any proof on his reconventional demand. The ruling complained of was predicated upon the compromise and settlement entered into between the contractor and owner on May 31, 1926, referred to supra, the court holding that they were bound thereby. The contractor earnestly contends that he was misled as to certain claims set up by the owner, and that the agreement was without consideration. We do not find that this contention is well founded. The compromise and settlement was freely and fairly made. All disputed claims within its terms were foreclosed by its execution. It is to the interest of the state that litigation

should cease, and courts will always look with favor on agreements and settlements looking to that end. Our conclusion is that the ruling complained of is correct.

For the reasons assigned, the judgment for $1,070, with interest thereon, in favor of C. W. Alexius, appellee, against the American Employers' Insurance Company, appellant, is annulled and the demand of the said Alexius, appellee, is rejected at his cost; the judgment in favor of plaintiff and appellee, Dr. F. Fenwick Young, against the defendants and appellants, Percy S. Barelli and the American Employers' Insurance Company, in solido, is amended and reduced on the principal sum from $8,709 to $300.35, and on the award for attorney's fees from $1,000 to $100, costs of the appeal to be paid by the plaintiff and appellee; the judgment is affirmed in all other respects.