419 So.2d 112 (1982)
SALLING WIPING CLOTH CO., INC., Plaintiff-Appellant,
v.
SEWELL, INC., et al., Defendants-Appellees.
No. 14950.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1982.
*113 Egan, Cook & Titone by Reuben W. Egan, Shreveport, for plaintiff-appellant.
Cook, Yancey, King & Galloway by Bernard S. Johnson, Shreveport, for defendants-appellees.
Before MARVIN, SEXTON and NORRIS, JJ.
SEXTON, Judge.
In this suit to enforce the acceleration provision of a lease taken by the defendant, Sewell, Inc., the performance of which was guaranteed personally by the defendant Sarrah Y. Loggins, the defendants filed a peremptory exception asserting compromise. This exception was referred to the merits. Subsequent to trial that exception was sustained and the plaintiff now appeals. The judgment of the trial court is affirmed for the reasons set out hereinafter.
On or about July 1, 1980, defendant, Sewell, Inc., leased from plaintiff, Salling Wiping Cloth, Inc., certain premises in Bossier Parish for a period of five years. The amount of payment due monthly was specified in the contract. Defendant-lessee's performance on the terms of the lease was guaranteed by Sarrah Y. Loggins, mother of the corporation's sole stockholder, Jeffrey Haughton.
On the same date as the lease, Salling sold to Sewell all of the accounts receivable, processing equipment, a truck and stock in trade in a $30,000 credit sale. A note and chattel mortgage for the purchase price was taken. Sarrah Y. Loggins was endorser of the note.
Payments were made on July 1, 1980, through February 13, 1981. Defendant then became delinquent with its rental payments, causing plaintiff to issue a written notice that defendant should pay the rent due. No payments were forthcoming and plaintiff instituted this action on July 13, 1981, to accelerate payments as provided for in the lease. Plaintiff alleges that the unpaid rent is $33,450. Plaintiff also claims interest of 8% per annum from May 3, 1981, and attorney fees as called for in the lease.
On May 2, 1981, prior to suit, as a result of defendant Sewell's inability to pay rentals and the resulting threat of court action from the plaintiff, a "Settlement Agreement" was entered into. By the terms of this agreement Sewell's assets were to be transferred to a third party, Johnny Byrd, and all proceeds of that sale plus other sums were to be paid to the plaintiff in exchange for his cancellation of the lease between defendant and itself.
Also under the terms of the Settlement Agreement, upon full payment of $21,000 by Sewell to Salling, Salling was to return to Sewell the July 1, 1980, promissory note in the amount of $30,000 marked paid in full and cancel the chattel mortgage of the same date which secured the note. Further, upon Sewell's payment of $1,750 for past due rent and current rent through May 1981, Salling was to cancel the July 1, 1980, lease to Sewell.
The terms of payment of the $21,000 were: $5,000 upon execution of the Settlement Agreement, and $16,000 upon final payment of the purchase price of Sewell's assets by Byrd (which contract of sale was recognized in the Settlement Agreement). Additionally, Sewell was to transfer to Salling its open accounts, pay its outstanding debts, and convey to Salling a 1977 Chevrolet van.
Pursuant to the terms of the Settlement Agreement, $5,000 was timely paid on May 3, 1981. The cash sale of Sewell's assets amounted to $13,327.40. This amount was immediately transferred to the plaintiff upon receipt by defendant. Left outstanding was payment of the balance of the $16,000 amounting to $2,672.60, plus payment of the outstanding debts incurred by Sewell, which the Settlement Agreement called for to be paid before June 1, 1981.
*114 On June 1, 1981, Mrs. Loggins presented plaintiff's attorney with a personal check in the amount of $5,911.19, representing the balance of the $16,000 and other sums called for. Mrs. Loggins requested that the check not be presented for payment until 3:00 p.m. that day, since she then had insufficient funds in her account to cover the check. However by 3:00 p.m. she assured the plaintiff's attorney that sufficient funds would be transferred. Prior to 3:00 p.m. on June 1, 1981, the plaintiff's attorney informed Mrs. Loggins that the check she presented was unacceptable due to an additional clause contained on the rear of the check. This clause stated:
"This check constitutes payment in full to Salling Wiping Cloth Co. Inc. for Sewell, Inc. for all lease payments, accounts payable, note payments and hereby releases Sewell and Thomas Jeffrey HAUGHTON and Sarrah Y. Loggins and their successors and assigns from any and all claims for detriment, injuries and damages of whatsoever nature and character, which heretofore sustained or may hereafter sustain and fully relieves the aforesaid of any obligation whatsoever in connection herewith."
No money was transferred by Mrs. Loggins to cover the check, but the check was never presented for payment. Her banker testified that had the check been presented it would have been paid by the bank.
Plaintiff did not present the check because of the above clause, believing it varied the terms of the settlement agreement, also because of concern over unknown outstanding debts of Sewell. Thereafter this suit was filed asserting the original lease, to which defendants filed the previously mentioned exception.
The trial court found that the terms of the settlement or compromise agreement had been substantially complied with and, having referred the peremptory exception to the merits, sustained that exception after the trial on the merits.
The defense of compromise may properly be raised by the peremptory exception of res judicata. Bielkiewicz v. Rudisill, 201 So.2d 136 (La. App. 3d Cir. 1967) and Ditch v. Finkelstein, 399 So.2d 1216 (La. App. 1st Cir. 1981). We note that the exception in question here, though not styled as an exception of res judicata, is styled as a peremptory exception and adequately pleads the issue of compromise. Any defect in the label is of no significance. LSA-C. C.P. Art. 854 and Tschirge v. Land-O-Lakes, 98 So.2d 270 (La. App. 1st Cir. 1957).
LSA-C.C. Art. 3071 provides the definition of "compromise" in Louisiana. A compromise is an agreement made for the purpose of preventing or ending a lawsuit in which two or more persons "adjust their differences by mutual consent." As LSA-C.C. Art. 3071 further provides, the contract of compromise is preferred by the parties to the hope of gaining, balanced by the danger of losing. The contract of compromise must be reduced to writing or recited in open court, and of course a contract of compromise, like any other conventional obligation under the Civil Code, requires consent and capacity. Other crucial codal provisions stipulate that compromises "regulate only the differences which appear clearly to be comprehended in them,"[1] and that compromises have the legal efficacy of judgments, possessing as they do, "a force equal to the authority of things adjudged."[2]
Given the Code's abstract and functional definition of "compromise" our task is to determine whether the legal requirements of a valid compromise have been met in this case, and the scope of such a compromise if it has legal existence. The record clearly demonstrates that there was an agreement confected in this case for the purpose of forestalling potential litigation. The legal requirement of mutual concessions and sacrifice or reciprocal considerationin more precise civilian terminology, causeis embodied in the codal terminology that the parties prefer the contract of compromise *115 "to the hope of gaining, balanced by the danger of losing."[3] This requirement of reciprocal consideration is inherently present here. The plaintiff preferred reasonably immediate payment under the terms of the compromise obligation to the hope of recovering all outstanding amounts owed him when that hope was evaluated in light of the defendant's potential insolvency. The defendant obviously preferred the reduced terms of the compromise to the hope of winning a potential lawsuit when that hope was weighed against the danger of being adjudged liable for the entire amount. The compromise at issue here has been reduced to writing, and the record contains no allegations of failure of consent or capacity. With respect to the provision of LSA-C.C. Art. 3073 that compromises comprehend only those matters which the parties intend to be therein resolved, it appears that the instant compromise is all-inclusive since, by its very terms, it extends to "all claims presently existing among [the parties]."
As the foregoing discussion indicates, the codal requirements of a compromise have basically been satisfied, and there is little question as to the scope of the instant agreement. The next issue here concerns the question of whether this agreement has been employed by the parties to "adjust their differences."[4] Several courts have interpreted this clause to mean that a valid compromise does not exist unless there is a dispute as to the amount owed. Green v. National Life & Accident Ins. Co., 183 So. 604 (La. App. Orl. App. 1938); Breeland v. Kenner, 174 So. 678 (La. App. Orl. App. 1937); Aronson v. Pallet, 173 So. 545 (La. App. Orl. App. 1937); Cruze v. Life Ins. Co. of Va., 184 So. 735, rehearing denied 185 So. 492 (La. App. Orl. App. 1938). See also, Litvinoff, Civil Law Treatise, §§ 390 and 392 (1969).
But although the classic view is that there must be a controversy as to the amount in dispute in order for there to be a valid compromise, our research has revealed a number of instances in which our courts have upheld the validity of compromise agreementseven though there was no dispute as to the amount owed. In Oil Purchasers, Inc., v. Keuhling, 334 So.2d 420 (La. 1975), the Supreme Court upheld an agreement between an attorney and his heir which reduced the contingent fee of the attorney and which was submitted as the trial court's judgment "on the joint stipulation of all parties...." Kuehling, supra, at 423. What is significant about Kuehling is that there was no question that the initial contract indisputably purported to convey a 25% contingent interest in certain immovable property. Thus in Kuehling, the Supreme Court upheld the efficacy of an agreement viewed as a compromise, even though there was not, in the classic sense, a dispute as to the amount owed under the original agreement. In Stern v. Williams, 365 So.2d 1128 (La. App. 4th Cir. 1978), according to the facts recited, there was apparently no dispute as to the amount of "certain monetary obligations" owed and the parties entered into an agreement settling the amount owed. However, despite the lack of an initial dispute as to the amount of these monetary obligations, the court upheld and enforced the validity of the agreement using the concepts of compromise.
It appears furthermore that in neither Smith Construction Co. v. Brechtel, 51 So.2d 643 (La. App. Orl. App. 1951) nor Midlo & Lehmann v. Katz, 195 So.2d 383 (La. App. 4th Cir. 1967) was the court preoccupied with the requirement that there be an amount in controversy. In Brechtel, there was no genuine dispute as to the original amount of $1,509.40 that was owedalthough one party contested the correctness of that amount he "failed to point out to [the court] wherein this balance [was] in error." Brechtel, supra, at p. 644. Despite *116 the absence of a genuine dispute as to the amount owed, the court found that a compromise existed.[5] In Midlo, there was no dispute that an amount of $6,775.50 was owed in legal fees; this uncontested debt was settled however, by an agreement in which the debtor agreed to pay $2,900.00. Despite the absence of a dispute as to the amount originally owed, the court believed it "unnecessary to discuss the question of whether the agreement ... complies with all of the requirements of a transaction or compromise under LSA-C.C. Art. 3071.... Quite clearly it does." Midlo, supra, at p. 386.
Our holding today is that the Louisiana Civil Code does not invariably require a dispute as to the amount owed. This view is implicitly supported by much of the jurisprudence. Moreover, it appears to us that our interpretation of LSA-C.C. Art. 3071 is faithful to the literal wording of the Code. Article 3071 nowhere requires that there be a dispute as to the amount owed. The Code stipulates, instead, that a compromise is an agreement in which the contracting parties "adjust their differences." Our reading of this pivotal phrase leads us to believe that an "adjustment of differences" comprehends that parties forego the adversarial contentiousness and opposition inherent in a lawsuit in favor of a conciliatory agreement. Stated differently, an "adjustment of differences" connotes that parties refrain from a legal disputea lawsuitin favor of conventionally resolving their differences. Thus the "differences" of which LSA-C.C. Art. 3071 speaks is nothing more than the adversarial stance in potential litigation of opposing parties; the "adjustment" is the contractual resolution of this adversarial stance.
Within the context of these definitions of the codal terms, there has been an adjustment of differencesor a compromisein this case. We in no wise pretend to ignore the case law mandating that there is no compromise without an amount in dispute. However, at the risk of rejecting judicial pronouncements of the past, we elect to literally adhere to the codal language itself.
Having determined today that Article 3071 does not invariably require that there be an amount in dispute in order for a valid compromise to exist, our conclusion inescapably is that a compromise does exist. Given that a compromise exists, the next issue is to delineate its effect. Our conclusion is that a valid compromise effectively abrogates and nullifies the prior claim or contract which was compromised by it, so that the only legal recourse of the parties is to enforce their rights within the context of the compromise agreement. This conclusion is implicit in the plethora of decisions in which suit on an antecedent claim or obligation has been barred by an agreement which compromised that claim or obligation. See, e.g., Matthew v. Melton Truck Lines, Inc., 310 So.2d 691 (La. App. 1st Cir. 1975); Charbonnet v. Ochsner, 236 So.2d 86 (La. App. 4th Cir. 1970); Tschirge, supra; Davis-Wood Lumber Co. v. Farnsworth & Co., 171 So. 622 (La. App. 1937); Kelly v. Homer Compress Co., 110 La. 983, 35 So. 256 (1903). As has been observed by Beverly Hess in a well written student article, "Once the compromise is accepted, the plaintiff is estopped from making further claims, for he is without legal right to sue. If he subsequently brings an action, the settlement can be pleaded in bar of his claims." 14 Tulane L. Rev. 282, 287 (1940).
This theory that a compromise agreement abrogates the preceding claim or obligation which it compromises is supported by codal analysis. Article 3078 provides that compromises have, between the parties, the binding force of a legal judgment. It is a rudimentary proposition of law that an obligation is merged with the judgment of which it is a legal predicate, so that the obligation no longer has a distinct, separate or self-subsistent existence. See, *117 e.g., Glazer Steel Corp. v. Larose Shipyards, Inc., 372 So.2d 250 (La. App. 1st Cir. 1979).
Since a compromise has the effect of a judgment, it causes the merger of the antecedent obligation or claim upon which it is based with itself, leaving the antecedent obligation with no separate or distinct existence. Thus a valid compromise, by operation of the doctrine of judgment and merger, functionally and theoretically nullifies the antecedent obligation which it compromises, so that the antecedent obligation may no longer exist to provide a self-subsistent cause of action. An exception to this rule would operate if the contract of compromise was abrogated and extinguished. However, the contract of compromise at issue here was not legally abrogated.
However, counsel for appellant urges that it is the original contracts which should define the rights of the parties. Under Midlo, supra, and Smith Construction Co., supra, the breach by one party of the compromise agreement abrogates the compromise agreement and reinstates the right of the other party to sue under the original contract. This court nevertheless cannot accept the proposition that the appellant may in this case resort to the original contracts. The obvious discrepancy between the facts of Midlo and Brechtel cases and the facts of the instant case leaves us with no option but to reject the application of Midlo and Brechtel here. In Midlo, the appellant entirely neglected or refused to pay the amount he owed under the compromise despite the fact that he was a "`man of means'" and entirely capable of discharging this debt; in Brechtel, appellee testified that the appellant "`never gave me a dime'" towards discharging the amount due under the compromise contract. In the instant case, to the contrary, the defendant substantially complied with the terms of the compromise agreement and made a good faith effort to discharge the amount owed under the compromise agreement. Unlike the situations in Midlo and Brechtel where the court found that virtually no attempt at compliance had been made, the trial court found here (and we agree) that the defendant's actions amounted to substantial compliance with the terms of the agreement. We thus find that where, as here, there is substantial compliance with the terms of the compromise agreement, there has not been a breach of the compromise agreement. In short, we decline to follow the rule of Midlo and Brechtel where there has been substantial compliance with the compromise agreement. Whether there has been substantial compliance with the terms of the compromise agreement in any given case, of course, depends upon a case-by-case analysis.
It is important to note that the Louisiana jurisprudence supports the proposition that upon a breach of a contract of compromise, the injured party's remedy is to sue upon the contract of compromise. Breach of compromise does not cause its abrogation and the resurrection of the original contract. Ditch, supra; Mongrue v. State Farm Mutual Automobile Liability Insurance Company, 396 So.2d 466 (La. App. 4th Cir. 1981); Succession of Teddlie, 385 So.2d 902 (La. App. 2d Cir. 1980); Keuhling, supra; Stern, supra; Collier v. Administrator, Succession of Blevins, 136 So.2d 774 (La. App. 4th Cir. 1962); Tschirge, supra; Wholesale Distributing Company v. Warren, 84 So.2d 250 (La. App. 2d Cir. 1955). It is pertinent to note that the result reached by this court today is in accord with a substantive policy long adhered to by the Louisiana courts. The compromise, as a legal device, promotes efficiency by permitting parties to resolve their differences without resorting to the judicial machinery. It is for this reason that compromises are favored under the law, and are not set aside absent vices such as bad faith, error or fraud. See, e.g., Young v. Barelli, 169 La. 319, 125 So. 258 (1929); Jackson v. U.S. Fidelity & Guaranty Co., 199 So. 419 (2d Cir. 1940).
We thus hold that the Louisiana Civil Code does not invariably require a dispute as to the amount owed in order for a valid compromise to exist; the requirement that there be "differences" between parties which are adjusted by the compromise may be satisfied by the existence of the adversarial *118 and opposed legal positions of the parties. We hold also that where there has been substantial compliance with the terms of a compromise agreement, the compromise agreement is not abrogated and the original contract is not resurrected. The sole recourse of the parties is to sue upon, and resolve their differences within the framework of, the compromise agreement.
Therefore, the judgment of the trial court in all respects is affirmed at appellant's cost.
AFFIRMED.
NOTES
[1] LSA-C.C. Art. 3073.
[2] LSA-C.C. Art. 3078.
[3] LSA-C.C. Art. 3071 The requirement that compromise contracts be supported by consideration was made explicit in Green v. National Life & Accident Ins. Co., 183 So. 604 (La. App. Orl. App. 1938) and Reid v. J.P. Florio & Co., 172 So. 572 (La. App. Orl. App. 1937).
[4] LSA-C.C. Art. 3071.
[5] The court did later find, however, that the compromise agreement had been abrogated. Implicit in the concept that a compromise agreement has been abrogated, however, is the concept that the compromise has had legal existence and validity.