Rensink, Administratrix, Respondent, v. Wallenfang and others, Appellants.

*October 5—November 3, 1959.*

For the appellants there were briefs by *Everson, Ryan, Whitney & O'Melia* of Green Bay, and oral argument by *James L. Everson.*

For the respondent there was a brief by *Cornelisen, Denissen, Farrell & Kranzush* of Green Bay, and oral argument by *E. D. Kranzush.*

FAIRCHILD, J. Appellants assert (1) that as a matter of law, Mr. Rensink was negligent with respect to stopping for the arterial; (2) that the question was improperly submitted to the jury; and (3) that Mrs. Rensink had effectively released those claims which accrued to her by reason of her husband's death. For the reasons which follow, we conclude that the judgment is to be affirmed.

■ *Negligence as a matter of law.* Appellants concede that there is evidence that Rensink made a stop within 30 feet of the near limits of the intersection as required by sec. 85.69, Stats. 1953. They point out, however, that he had

the duty of making an efficient observation with respect to approaching traffic and that he could not enjoy the right of way over Wallenfang unless he made such observation. *Kraskey v. Johnson* (1954), 266 Wis. 201, 207, 63 N. W. (2d) 112. Appellants assert that Rensink could not make an efficient observation from the place where he did stop.

Mrs. Rensink could not remember where the Rensink car was when the second stop was made. Another witness testified that the front of the car was "right opposite the stop sign." The stop sign was located 18 feet west of the west curb of Monroe avenue, and about two and one-half feet west of the west edge of the crosswalk. Appellants point out that the view to the north along Monroe avenue from points in Crooks street was subject to the following obstructions: There were four cars parked along the west curb of Monroe avenue and the southernmost of these cars was about 20 feet north of the north curb of Crooks street. There were two elm trees between the sidewalk and the curb on the west side of Monroe avenue which were 34½ and 72½ feet north of the north curb of Crooks street. There was a brick building on the northwest corner of the intersection, 29 feet, 10 inches from the west curb of Monroe avenue, and 34 feet, 10 inches from the north curb of Crooks street. A utility pole was located approximately a foot north of the north curb of Crooks street and west of the sidewalk on the west side of Monroe avenue. Crooks street was 35 feet, eight inches wide, from curb to curb, and Monroe avenue 46 feet wide. Wallenfang and his passenger did not see the Rensink car until it was partly into the intersection, and 30 to 40 feet ahead of them.

Certainly appellants have demonstrated that there were obstructions and that at some, and perhaps at all, points within the 30 feet within which Rensink was required to stop there was partially obstructed vision to the north. They have not established, however, that the place selected

by Mr. Rensink was not as good a place from which to observe as any other within the 30 feet specified by the statute, nor have they established that Mr. Rensink could have seen Wallenfang if he had looked. There was testimony, evidently believed by the jury, that Wallenfang was traveling 35 to 40 miles per hour, and the same witness also testified that when Rensink started up from his stop, Wallenfang was 225 to 250 feet north of the point of impact. Appellants had the burden of proof on this issue. The jury may properly have found that Rensink stopped and that he may have made the best observation possible under the conditions existing, but did not see Wallenfang; that after entering the intersection, he failed to keep a sufficient lookout to the north while coming into the path of the Wallenfang car.

■ *Submission of the question.* The special verdict inquired whether Rensink was negligent in respect to "failure to stop at the stop sign." Appellants requested that the phrase "with respect to stopping before entering the intersection" be used. The appellants argue that the question as submitted was misleading. The court, however, instructed the jury with reference to the question as follows:

"Now, subdivision (a) of the third question inquires as to whether or not Harry Rensink was negligent with respect to failure to stop at the stop sign. In this connection, I instruct you that it is the law of this state that it shall be unlawful for the operator of any vehicle to fail to come to a full and complete stop within 30 feet of the near limits of an intersection at which there has been erected an official stop sign, or traffic signal, designating an artery for through traffic. I instruct you further that he must not only stop before entering the intersection, but he must stop and observe where an efficient observation may be had.

"The purpose of this law is so that he can make an efficient observation with respect to approaching traffic, or the absence of it, upon the arterial. One who physically stops

his car for the arterial and then plunges his car in imminent danger of a collision with a vehicle approaching from his left would not have the right of way which he would have if he entered the intersection before or at approximately the same time as the other car."

In view of the portion of the instructions above quoted, we see no error or abuse of discretion in phrasing the question as it was.

■ *The release.* Pursuant to a practice which is apparently widely followed by insurance companies in similar situations, negotiations with Mrs. Rensink for the settlement of her claim were carried on by an adjuster for the insurer of the car in which she was riding. The settlement was concluded three weeks before her husband's death, and she received $7,000. Each company contributed one half the amount. On that date, Mrs. Rensink signed a release on a printed form with blanks filled in by handwriting. The handwritten portions are included in brackets in the following quotation. After reciting the consideration, the material portions of the release read as follows:

"I/we hereby release and discharge [Harry Rensink—Home Mutual Ins. Co.—Norbert Wallenfang, Ronald Wallenfang & Integrity Mutual Casualty Co.] his or their successors and assigns, and all other persons, firms or corporations who are or might be liable, from all claims of any kind or character which I/we have or might have against him or them, and especially because of all damages, losses, or injuries to person or property, or both, whether developed or undeveloped, resulting or to result from accident on or about [March 6th], 19[55], at [Monroe & Crooks St., city of Green Bay, Wis.] and I/we hereby acknowledge full settlement and satisfaction of all claims of whatever kind or character which I/we may have against him or them by·reason of the above-mentioned damages, losses or injuries.

"I/we have represented that the injuries sustained are permanent and progressive and that recovery therefrom is

uncertain and indefinite, and in making this release and agreement, it is understood and agreed that I/we rely wholly upon my/our own judgment, belief, and knowledge of the nature, extent, and duration of said injuries . . ."

Mr. Rensink was present when the release was signed. About a week later, he had an operation, and died three weeks later from pneumonia which developed after the operation. There was testimony by the adjuster and Mrs. Rensink, objected to by appellants, that the adjuster told Mrs. Rensink the release covered her pain, suffering, and disability. The trial court concluded that by its terms, the release did not include Mrs. Rensink's cause of action for the wrongful death of her husband, although the court stated that if it were necessary, the release should, under the evidence, be reformed by reason of mutual mistake.

It is clear that Mrs. Rensink's cause of action for damages for the wrongful death of her husband was a new cause of action which arose three weeks after the release was signed. It could be said that her present claim *resulted* from the accident, but no liability existed or could exist until Mr. Rensink died and Mrs. Rensink survived. Any inclusion of her new claim within the terms of the release must be based upon the use of one or more of the following expressions: (1) "All claims of any kind or character which I/we have or *might have;*" (2) "especially because of all damages, losses, or injuries to person or property, or both, *whether developed or undeveloped;*" (3) "resulting or *to result* from accident." (Italics supplied.)

Appellants concede that if there is room for interpretation, a familiar rule of construction requires, under these circumstances, that the release be construed against them. Applying that rule we conclude that the release did not operate upon claims for wrongful death, liability for which

first arose after the release was executed. Other rules lead to the same conclusion.

"Great liberality is allowed in construing releases. The intent is to be sought from the whole and every part of the instrument; and where general words are used, if it appears by other clauses of the instrument, or other documents, definitely referred to, that it was the intent of the parties to limit the discharge to particular claims only, courts, in construing it, will so limit it; and although the terms of a release are general, their operation will be limited to those things within the contemplation of the parties at the time of its execution." 45 Am. Jur., Release, p. 693, sec. 28.

"If it is his intention to do so a person may, by his general release, discharge a claim the existence of which is unknown to him. But the doctrine is firmly rooted in equity that when an instrument is so general in its terms as to release the rights of a party of which he was ignorant, and which were not in contemplation of the bargain at the time it was made, the instrument will be restrained to the purposes of the bargain, and the release confined to the right intended to be released." 45 Am. Jur., Release, p. 694, sec. 30.

In *Nelson v. Boos* (1959), 7 Wis. (2d) 393, 398, 96 N. W. (2d) 813, it is said:

"In construing this release we must read the instrument in its entirety. The intent of the parties must be sought from the whole and every part of the instrument and from the surrounding conditions and circumstances."

Nothing in the circumstances of this case suggests that the parties to the settlement were anticipating Mr. Rensink's death. The parties released included Wallenfang, his father, their insurer, Rensink, and his insurer. All may have been liable to Mrs. Rensink by reason of her own injuries, and all had a similar interest in being released from those claims. Each of the insurers contributed equally to the settlement.

But Mr. Rensink's insurer had no apparent interest in a release from liability for Mr. Rensink's death.

"A release ordinarily operates on the matters expressed therein which are already in existence at the time of the giving of the release. Accordingly, demands originating at the time a release is given or subsequently, and demands subsequently maturing or accruing, are not as a rule discharged by the release unless expressly embraced therein or falling within the fair import of the terms employed." 76 C. J. S., Release, p. 699, sec. 53.

We do not consider that the language employed in the release necessarily included a claim for a death which had not yet occurred. In so far as the words of the release appear to embrace claims based upon future events, we conclude that they refer only to the further development or more-complete ascertainment of damages, losses, and injuries, liability for which did or might exist at the time the release was executed.

We find it unnecessary, as did the trial court, to reform the release.

*By the Court.*—Judgment affirmed.