308 So.2d 824 (1974)
Mrs. Libby Krasnoff SCHIFFMAN, Individually and as Natural Tutrix of Her Minor Children, Pamela, Naomi, Howard, and Joel Schiffman,
v.
SERVICE TRUCK LINES, INC., et al.
No. 6556.
Court of Appeal of Louisiana, Fourth Circuit.
December 30, 1974.
Concurring in Denial of Rehearing March 12, 1975.
*825 Michael S. Guillory, Krasnoff and Guillory, Metairie, for plaintiff-appellant.
J. Walter Ward, Christovich & Kearney, New Orleans, for defendant-appellee.
Before REDMANN, LEMMON and STOULIG, JJ.
REDMANN, Judge.
May a wife, as part of a compromise between her tort-injured husband and the tortfeasor, effectively release her possible claim against the tortfeasor for her own losses from the husband's death if it results from the tort?
A widow appeals from the dismissal of her wrongful death action on exception of res judicata, based on a "receipt and release" which (if a compromise or transaction, C.C. art. 3071) has, "between the interested parties, a force equal to the authority of things adjudged," C.C. art. 3078.
We conclude that reasons similar to those which dictate a public policy against dealing in or renouncing rights in the succession of a living person, C.C. arts. 984, *826 1887, and 2454, dictate a public policy against dealing in or renouncing rights to an action for the wrongful death of a living person. Such a renunciation is therefore unenforceable because "contrary to morals" in the sense of C.C. art. 1892, and "contra bonos mores (contrary to moral conduct) or to public order" in the sense of C.C. art. 1895.

Facts
The petition alleges that a truck driver (made defendant with his employer and insurer) on June 18, 1968 negligently caused injury to the husband. The husband was rendered and remained comatose until death resulted February 1, 1973. The widow seeks damages for herself and four very young children. (The claim for the children is not a concern of this appeal.)
The "receipt and release" was executed September 13, 1972 by the wife as curatrix of her then interdicted husband, acknowledging receipt of $75,000 for her husband as his curatrix. But the instrument also recites that the wife "joins in her individual capacity the Release executed by her as Curatrix ... hereby releasing, remitting and forever discharging [defendants] from all claims ... which... Appearer has had, now has or may in the future have, in the event [the husband] should die, to recover for his conscious pain and suffering through the date of his death, all expenses incurred therefrom (except as may be asserted by the United States of America for the medical care provided and to be provided by it), and for her own individual losses and claims which may arise from his death." (Emphasis ours.)

Intent of Release
The wife argues the emphasized language is not explicit enough to include a wrongful death action, and does not purport to end all possible litigation since the four infant children's claims are not released. But we find no other meaning to this language than that the wife's individual claim for damages for the death of her husband is remitted.[1]

Validity of Remission
We hold the remission invalid as against the public policy prohibiting dealing in or renunciation of rights whose coming into existence requires the death of a living person.
The public policy is that of the Legislature, expressed in C.C. arts. 984, 1887, and 2454.[2] These articles do not contain any *827 express reference to the rights of survivors of a tort victim under C.C. art. 2315 (as amended). However, this omission is not suggestive of any intent to exclude wrongful death claims. Such claims were not allowed by law at the time of the enactment of the policy-expressing arts. 984, 1887 and 2454. Thus the framers of those articles had no occasion to consider whether to include or exclude the then nonexistent wrongful death action. Those articles' intent must be determined as of the time of their enactment; Geny, Method of Interpretation and Sources of Private Positive Law (La. Law Inst. trans.), § 99.
The wrongful death action (unlike the survival action for the victim's own damages) is not transmitted from the tort victim to his heirs, and in that sense is unlike succession. Thus, for example, wrongful death actions do not require a prohibition against the ancient practice of parents' obliging daughters and younger sons to renounce the parents' successions to preserve the successions intact for the oldest son (see Planiol, Civil Law Treatise [La.Law. Inst. trans.], III § 1969, n. 8).
Yet, the rule against acceptance of a living person's succession, La.C.C. art. 984, evidently proceeds from some other consideration. Buckland, A Textbook of Roman Law from Augustus to Justinian (3d ed.), 483, adds the reason that successions include debts, but recognizes as fundamental the reasoning of Justinian, Code 2.3.30, that the conditions of a sale of a succession are that the prospective decedent should die, and that the prospective heir should be called to the succession.
Pothier, Treatise on the Contract of Sale (trans. Cushing, 1839), § 527, p. 315, asserts that the sale of a succession is proscribed because "contrary to decency and good manners," that is, contra bonos mores.
Planiol, id. II, § 1013, notes this view of the immorality of "speculating] on the death of a living person who was ordinarily one of their relatives," though Planiol personally deems the reasoning "extremely feeble."
Our answer is far from free of doubt. We, however, conclude that contracting in future rights whose coming into existence requires a living person to die is no more acceptable in wrongful death cases than in succession cases in Louisiana.[3] Dealing in such rights is contrary to morals, moral conduct and public order in the sense of C.C. arts. 1892 and 1895 and therefore ineffective.
The judgment is reversed and the exception overruled.
STOULIG, J., dissents with reasons.
STOULIG, Judge (dissenting).
I respectfully dissent.
The majority opinion acknowledges that the "receipt and release" of September 13, *828 1972 executed by Mrs. Libby Krasnoff Schiffman is clear and unambiguous. Under its terms the appearer released and discharged the appellees from all claims that she individually now has and for her own individual losses and claims which may later arise from the wrongful death of her husband. The release was executed in connection with the compromise settlement of $75,000 for the injuries sustained by her husband in a vehicular highway accident. Mrs. Schiffman executed this release in her capacity as curatrix of the estate of her husband, who was interdicted because of his comatose condition and in her individual capacity as his wife. It is undisputed that at all times prior to and at the execution of the agreement, Mrs. Schiffman had the benefit of legal counsel. No implication of fraud or misrepresentation taints the instrument.
Approximately four and one-half years after the accident, Mr. Schiffman died and appellant filed the instant suit for wrongful death in her individual capacity and on behalf of the minor children. Peremptory exceptions of res judicata were filed based on the theory that under C.C. art. 3078 "transactions [or compromise] have, between the interested parties, a force equal to the authority of things adjudged." The trial court maintained the exceptions against the individual claim of Mrs. Schiffman but dismissed them as to the claim of the minor children.
The sense of the majority opinion is that even though the receipt and release is clear, unambiguous and explicit in releasing and forever discharging any individual claims of Mrs. Schiffman which may arise from the death of her husband, it is unenforceable as being in violation of the public policy and contrary to good moral conduct (contra bonos mores). The majority opinion further holds that the receipt and release executed by Mrs. Schiffman constituted a remission of the wife's claim rather than compromise, since she received no payment for the release of her individual rights.
In support of its position the majority opinion cites C.C. arts. 984, 1887 and 2454 as constituting the public policy of this State that prospective rights in the succession of a living person cannot be the object of a contract of acquisition or divestitute of the ownership for such rights. However, the majority reasons this public policy is dictated by the fact that the inhibited acts are naturally repugnant or reprehensible since they are dependent upon the death of a living person to become operative and therefore are contrary to good morals within the intendment of C.C. arts. 1892 and 1895.
Public policy of a state is expressed in its legislative enactments and its jurisprudence[1] which forms a basis or standard for determining what conduct serves the best interest of its people in given circumstances; however, not all laws involve moral judgments. Any actions contrary to or in conflict with these standards are considered against the public good and are declared invalid.
I agree with the holding of the majority that C.C. arts. 984, 1887 and 2454 constitute a declaration of the public policy of this State. However, I disagree that such policy was dictated by moral consideration. Nor do I find any indication in the articles themselves which tend to sustain this contention. It can be argued with equal validity that the primary motivation for the adoption of these articles was to zealously protect our laws of dissent and distribution, particularly as they relate to the legitime of forced heirs.
To support its conclusion the three cited codal articles were dictated by moral considerations, the majority alludes to one of Pothier's treatises in which he states the *829 sale of a succession is "contrary to decency and good manners." Apparently the Louisiana legislature disagreed. It is interesting to note in this connection C.C. art. 1888 permits a future succession right to be the object of a marriage contract. In this instance the redactors specifically sanction dealing in a future right that may only accrue on the death of a living person. Apparently good moral conduct is not offended.
In my opinion the public policy set forth in these codal articles are restricted to govern and prohibit only those actions therein designated as they relate to successions which have not as yet come into existence. Without speculating, I can find no basis for concluding that moral consideration prompted the enactment of this public policy.
Though admitting that a distinction does exist between the transmittal of rights to an heir in a succession and the statutory right of survivors in a wrongful death action under C.C. art. 2315, the majority opinion by analogy concludes the release of a right by a survivor in a prospective wrongful death action, being dependent upon the future death of the tort victim, is proscribed as being contrary to public policy of this State and good moral conduct. I cannot concur in this analogical reasoning, for it erroneously equates in legal significance the release of a right in a prospective wrongful death action with the acceptance, rejection or sale of an inhibited right in a future succession. The former involves the statutory course of action under tort law; whereas the latter governs the future heritable rights in the dissent and distribution of successions. Not every instrument whose efficacy depends on the death of a living person is per se against public policy or good morals, otherwise a valid disposition mortis causa could never be effected.
I find no provision in our Constitution, statutory law, or jurisprudential expression which inhibits as being against the public policy of this State a release of individual future rights which may inure or become executory upon the death of a living person. There has not been cited any authority for the proposition that the execution of such an agreement offends and violates good moral conduct.
On the contrary there is ample codal authority for an agreement of compromise between two or more persons for preventing or putting an end to lawsuits and to mutually adjust their differences by consent (C.C. art. 3071), and the redactors of our code have clothed these transactions with "a force equal to the authority of things adjudged" between these contracting parties (C.C. art. 3078).
Under the majority ruling, which precludes the valid compromising of a survivor's prospective claim for wrongful death under C.C. art. 2315, there would be little inclination to mutually adjust these claims without the necessity of a lawsuit. Stated otherwise whenever there is a probability, however remote, that a wrongful death action may eventually result from a tort injury the tort-feasor's inability to compromise all claims, including prospective survivor's rights, even though claimants would be willing to settle, would destroy incentive or predisposition toward compromise. In addition the finality of a settlement could never obtain as long as there existed a connexity, however tenuous, between the accident and the death of the injured party, regardless of the length of the intervening period between the two incidents.
The mere failure of the appellant to receive any direct remuneration for the release of her rights is not in itself sufficient to destroy the validity of the contract. It is impossible to determine what persuasive influence the release and waiver of appellant's rights for the wrongful death of her husband had on the defendants' willingness to pay $75,000 in compromise of her husband's disputed claim for damages against them. When considered as a whole, the indirect benefits flowing to the wife from *830 the compromise settlement does constitute a serious consideration sufficient to sustain the validity of the agreement and to have the effect of law between the parties governing its contents. Under our Civil Code the consideration for a contract need not be expressed and will be presumed unless the contrary is made to appear. The failure to express the consideration will not cause an agreement to be less valid. (C.C. arts. 1894 and 1900)
The general rule governing compromises to avoid litigation is set forth in the case of Meinerz v. Treybig, 245 So.2d 557, 559 (La.App. 3d Cir. 1971):
"* * * [C]ourts will not declare a contract void as against public policy in the absence of an express legislative or constitutional prohibition or a clear showing that the purpose of the contract contravenes good morals or public interest. * * *"
For the foregoing reasons I respectfully dissent.
LEMMON, Judge (concurring in the denial of rehearing).
I was originally concerned about the problem of double recovery. In this wrongful death action, the widow claimed, for example, damages for loss of support, an item which is normally based on the amount the husband would reasonably have been expected to provide over the course of his work life expectancy. Yet, damages for loss of future earnings and/or impairment of earning capacity obviously constituted a substantial portion of the $75,000.00 defendants paid in settlement of the husband's personal injury claim.
Nevertheless, if the widow successfully proves liability in this wrongful death action, the court can prevent a duplicate award based on the same projected wages, perhaps by allowing some type of credit for that portion of the settlement reasonably attributable to this item. On the basis that there will be no double recovery of the same item of damages, I agree that the release of wrongful death action should not be allowed prior to the accrual of the cause of action upon the death of the tort victim.
NOTES
[1] We adopt the view of intended remission as to the wife's claim, rather than compromise, because she received no payment as if in compromise. See Litvinoff, Obligations, § 376. The remission was onerous rather than gratuitous, however, because made in exchange for a payment to the husband in compromise of his claim. We recognize the implication that, rather than having the compromise's "authority of the thing adjudged," C.C. art. 3078, the release as a remission would defeat the original claim as an extinguishment, C.C. art. 2130. Extinguishment is declared to be an affirmative defense, to be pleaded in the answer, by C.C.P. art. 1005. However, C.C.P. art. 1005 also recites that compromise is an affirmative defense, despite C.C. art. 3078. Traditional Louisiana procedural concepts considered every exception a "means of defense," though limiting "defense, in its more restricted acceptation, ... to such exceptions as go to the merits, showing that the action is neither just nor well founded," C.P. (1870) art. 330. C.P. art. 345 defined "[p]eremptory exceptions, founded on law [as] those which, without going into the merits of the cause, show that the plaintiff can not maintain his action, either because it is prescribed or because the cause of action has been destroyed or extinguished."

Today's C.C.P. art. 923 declares the "function of the peremptory exception is to have the plaintiff's action declared legally nonexistent, or barred by effect of law, and hence this exception tends to dismiss or defeat the action." C.C.P. art. 927 states that the objections raisable by the peremptory exception "are not limited to" the five it lists, and Comment (b) asserts that no pertinent change in the law was intended.
We conclude that remission of the obligation sued on is an objection raisable by the peremptory exception.
[2] Art. 984. The acceptance or rejection made by the heir, before the succession is opened or left, is absolutely null and can produce no effect; but this does not prevent the heir who has thus accepted, from accepting or rejecting validly the succession when his right is complete.

Art. 1887. Future things may be the object of an obligation. One can not, however, renounce the succession of an estate not yet devolved, nor can any stipulation be made with regard to such a succession, even with the consent of him whose succession is in question.
Art. 2454. The succession of a living person can not be sold.
[3] We have not found a discussion of the question in other states. We have found two cases in which a pre-death release was given effect. In F. W. Woolworth Co. v. Todd. 1951, 204 Okl. 532, 231 P.2d 681, one of several contentions was that the pre-death release was contrary to public policy. However, the court's only answer was that the release was not "contrary to or prohibited by" the wrongful death statute (there, a constitutional provision); id. at 685. In Petersen v. Kemper, 1945, 70 S.D. 427, 18 N.W.2d 294, 297, the pre-death release was only attacked as a "release of a cause of action which has not come into existence." There was no consideration of wrongful death releases prior to the death as a special category affected by special policy considerations.
[1] As stated in the case of W. L. Slayton & Co. v. Newton & Morgan, 299 F. 279, 280 (5th Cir. 1924): "The sources of the public policy of a state are the Constitution, the laws, and the judicial decisions of the court of last resort of that state."