630 So.2d 741 (1994)
Ruth BROWN, Individually and on Behalf of Her Minor Daughter, Kimberly Lynn Brown
v.
DRILLERS, INC., et al.
No. 93-CC-1019.
Supreme Court of Louisiana.
January 14, 1994.
*743 Charles R. Moore, Moore, Walters & Shoenfelt, Baton Rouge, for applicant.
Stephen H. Vogt, Durrett, Hardin, Hunter, Dameron & Fritchie, J. Reginald Keogh, Keogh, Cox & Wilson, Baton Rouge, W. Gerald Gaudet, L. Michael Cooper, Voorhies & Labbe, James M. Dill, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, Kathleen A. Manning, Henri Wolbrette, III, Lamont P. Domingue, McGlinchey, Stafford, Cellini & Lang, New Orleans, for respondent.
*744 HALL, Justice.[*]
The instant case is a sequel to our recent decision in Daigle v. Clemco Industries, 613 So.2d 619 (La.1993). Daigle repudiates the holding in Schiffman v. Service Truck Lines, Inc., 308 So.2d 824 (La.App. 4th Cir.1974), that a pre-death release of a wrongful death claim is contra bonos mores, and declares that a beneficiary under LSA-C.C. Art. 2315.2 can settle his or her potential wrongful death claim before the injured party dies and such right accrues. We granted writs in the instant case to resolve a related issue not presented in Daigle, supra. The issue presented in the instant case is whether a predeath release executed by both a husband and his wife of all their claims arising out of the husband's personal injuries, but not expressly referring to his death as a potential consequence of the claimed tort, encompasses the wife's subsequently accruing wrongful death claim.
Refining Daigle's holding that such a predeath release is permissible, we add a requirement that the release instrument unequivocally reflect, while not necessarily by express reference, that the parties clearly contemplated a compromise of future wrongful death claims. For the reasons that follow, we find that the release instrument in the instant case does not. We thus reverse the court of appeal's decision dismissing the wife's wrongful death claim and remand.

I.
On February 9, 1979, Buel Brown fell from a drilling rig at the Strategic Petroleum Reserve Project in Bayou Choctaw, Louisiana. Seeking recovery for his injuries, Buel Brown filed suit, naming numerous entities as defendants, but serving only the following named defendants: National Union Fire Insurance Company of Pittsburgh, Pennsylvania; Granite State Insurance Company; The Home Indemnity Company; Pacific Employers Insurance Company; Millers Mutual Insurance Association of Illinois; Harbor Insurance Company; Employers Casualty Company; and Drillers, Inc. (hereinafter collectively referred to as "Defendants"). In 1980, the petition was amended to add as a party plaintiff Buel Brown's wife, Ruth Brown, seeking loss of consortium damages.[1]
In September 1982, Buel and Ruth Brown settled their pending suit. In connection therewith, the parties' attorneys executed a Settlement Agreement, reflecting the terms of the settlement. One of those terms was that upon receipt of the settlement proceeds, both Buel and Ruth Brown would execute a Receipt, Release, Indemnification and Subrogation Agreement in Defendants' favor (hereinafter referred to as the "Release Agreement").
On September 8, 1982, both Buel and Ruth Brown, with the advise and assistance of counsel, executed the Release Agreement. That agreement is the crux of this case, and contains the following recital:
That for and in consideration of the sum of NINE HUNDRED THOUSAND AND NO/100 ($900,000.00) DOLLARS, and an annuity of ONE HUNDRED THOUSAND AND NO/100 ($100,000) DOLLARS, payable in twenty (20) years[2] this date paid by [Defendants[3]] to Buel Brown, receipt of *745 which is hereby acknowledged, said Buel Brown and his wife Ruth Brown do by these presents:
(1) Grant a full release, discharge, and acquittance... to [Defendants] of and from any and all claims, demands, causes or rights of action or suits at law or in equity of whatsoever kind of [sic] nature, which Buel Brown and/or Ruth Brown have or may have against them or against any one or more of them for or because of any manner or thing done, admitted, or suffered to be done by [Defendants], prior to and including the date hereof, particularly on account of or relating in any way to injuries suffered by Buel Brown on or about February 9, 1979, when he fell from a drilling rig at the Strategic Petroleum Reserve Project in Bayou Choctaw, Louisiana, including, but not limited to, the matters asserted in the lawsuit styled "Buel Brown v. Drillers, Inc., et al." bearing number 23-859 on the docket of the Eighteen Judicial District Court for the Parish of Iberville; the aforesaid amount of NINE HUNDRED THOUSAND AND NO/100 ($900,000.00) DOLLARS, and the ONE HUNDRED THOUSAND AND NO/ 100 ($100,000) DOLLARS annuity paid to Buel Brown, simultaneously with the execution of this instrument being a full and final payment, settlement, and compromise of any and all claims, demands, causes and/or rights of action ... which Buel and/or Ruth Brown, their successors, assigns, employees, agents, and lessees, have or may have against [Defendants]; Buel Brown and Ruth Brown further instruct their attorney to dismiss with prejudice, "Buel Brown v. Drillers, Inc. [supra ]," it being the intent hereof that Buel Brown and Ruth Brown, in consideration of the afore-mentioned payment made to Buel Brown, grant a full and complete release and discharge in connection with the aforesaid matters ... to [Defendants].
Further, the Release Agreement includes an express indemnity provision, requiring that Buel and Ruth Brown hold harmless, defend and indemnify Defendants for any future claims asserted as a result of Buel Brown's injuries; particularly, Paragraph 3 of the agreement recites that Buel and Ruth Brown:
Bind and obligate themselves, their heirs, administrators, and executors to hold harmless, defend and indemnify [Defendants] for the injuries Buel Brown alleges he sustained and to each and all of them to hold harmless and to indemnify them or any one of them from any losses or damages of any nature whatsoever sustained or which may be sustained in the future, directly or indirectly, as a result of the injuries heretofore recited, because of other claims, demands, or causes of action of whatever type or kind which may be made against them by Buel Brown, Ruth Brown, their heirs, administrators, executors or assigns ...
Still further, the Release Agreement contains a representation by Buel Brown to the effect that he had consulted with his physicians, was advised regarding the prognosis of his injuries, and disclaimed any rights in the event "his condition worsens in the future"; particularly, Paragraph 4 of the agreement states that Buel Brown:
[W]arrant[s] that he has discussed his physical, medical, and mental condition with physicians of his own choosing or with physicians with whom he is satisfied, and he is fully aware of his medical, physical, and mental condition and is aware of the prognosis for the future. The said Buel Brown further warrants that he is aware of the fact that his condition may grow worse than it is, or seems to be, and that surgery or other further treatment may be required in the future; that in executing this Receipt, Release, Indemnification, and Subrogation Agreement, he is completely giving up and discharging any and all rights he has and that he may never again proceed against such parties in the event his condition worsens in the future; and that he is desirous of accepting the sum of NINE HUNDRED THOUSAND AND NO/100 ($900,000.00) DOLLARS, and the ONE HUNDRED THOUSAND ($100,000.00) DOLLAR annuity in full and final settlement and discharge of all of his legal rights ... arising out of or resulting from his injuries as aforesaid, and that he is of *746 the opinion that this settlement is reasonable and proper under the circumstances.
As required by the Release Agreement, the pending lawsuit was dismissed. However, in May 1987, approximately five years after the release instrument was executed, Buel Brown died as a result, at least in part, of the injuries he sustained in the 1979 accident. Ruth Brown then filed the instant wrongful death action on behalf of herself and her minor daughter, Kimberly Brown, against Defendants. Answering that suit, Defendants interposed the release instrument. More particularly, in their answer, Defendants asserted four affirmative defenses: release, indemnity, confusion and set off. Defendants also filed a third party demand against Ruth Brown for indemnification; Defendants alleged that under the indemnity provision of the instrument, Ruth Brown was required to hold harmless, defend and indemnify them for the wrongful death claim she asserted on Kimberly Brown's behalf.
Thereafter, Defendants filed a motion for summary judgment, claiming, among other things, that Ruth Brown's wrongful death claim was barred by the release instrument. Ruth Brown responded by filing her own affidavit. In her affidavit, she attested that "[b]y signing the document, she did not intend to release a future wrongful death claim," and that "[a]t the time she signed the document, she did not think that [Buel Brown] would die from his injuries but would grow old."
Citing the holding in Schiffman v. Service Truck Lines, Inc., 308 So.2d 824 (La.App. 4th Cir.1974), that an anticipatory waiver a wrongful death claim is contra bonos mores, the district court held that Ruth Brown could not have compromised her claim or her minor child's claim for wrongful death before her husband died. While Defendants' application for supervisory writs was pending, we handed down our decision in Daigle v. Clemco Industries, 613 So.2d 619 (La.1993), repudiating the Schiffman holding and declaring that a prospective beneficiary under LSA-C.C. Art. 2315.2 can release his or her future wrongful death claim before the tort victim dies.
Citing Daigle, supra, the court of appeal granted Defendants' application in part,[4] and reversed in a brief per curiam peremptory writ grant and order. Specifically, the court of appeal held that the release instrument Ruth Brown signed was not contra bonos mores, but rather was "a valid compromise and settlement" of all her claims against Defendants and that it "shall be given effect." In so holding, the court of appeal neither considered the Civil Code articles on transaction and compromise, nor discussed the parties' intent as reflected in the signed release instrument.
We granted Ruth Brown's writ application to consider the correctness of that decision. 619 So.2d 557 (La.1993). Based on the following analysis of the codal articles governing transaction and compromise and of the parties' intent as reflected in the release instrument, we find that the instrument does not clearly contemplate a release of future wrongful death claims.

II.
As evidenced by the Release Agreement,[5] the parties have entered into a transaction *747 or compromise. The codal articles governing transaction and compromise are set forth in LSA-C.C. Arts. 3071 through 3083.[6] LSA-C.C. Art. 3071 defines a compromise as "an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing." LSA-C.C. Art. 3078 declares the effect of a compromise, providing that a compromise has the legal efficacy of a judgment, possessing "a force equal to the authority of things adjudged," and that a compromise "can not be attacked on account of any error in law or any lesion." LSA-C.C. Art. 3078; see Salling Wiping Cloth Co. v. Sewell, Inc., 419 So.2d 112, 114 (La.App. 2d Cir.1982). Based on LSA-C.C. Art. 3078, a valid compromise can form the basis of a plea of res judicata. Rivett v. State Farm Fire and Casualty Co., 508 So.2d 1356, 1359 (La. 1987).
As authorized by LSA-C.C. Art. 3078, Defendants interposed the release instrument here in the same manner that a judgment is interposed to support an exception of res judicata.[7] The burden of proof in the present case is thus on Defendants to establish the requisites for a valid compromise, including the parties' intent to settle the differences being asserted in the action in which it is interposed. Rivett, supra; Shepherd v. Allstate Ins. Co., 562 So.2d 1099, 1101 (La.App. 4th Cir.1990); Schmidt v. Doe, 514 So.2d 614, 616 (La.App. 4th Cir.1987).[8]
While Defendants dispute the latter procedural point, contending that Plaintiff has the burden of proof here, the cases on which they rely involve attempts by plaintiffs to rescind a compromise. Saunders v. New Orleans Public Service, Inc., 387 So.2d 603, 605 (La. App. 4th Cir.), writ denied, 394 So.2d 614 (La.1980); Barnhill v. Consolidated Medical, Disability & Life Trust, 569 So.2d 1115, 1117 (La.App. 3d Cir.1990), writ denied, 572 So.2d 93 (La.1991); Ellison v. Michelli, 513 So.2d 336 (La.App 4th Cir.1987). Those cases stand for the proposition that the burden of establishing the invalidity of a compromise is on the party attacking the instrument.[9] This *748 is not such a case. Plaintiff does not attack the validity of the release instrument; rather, she contends that it does not extend to the wrongful death claims asserted.
Shifting back to the codal provisions, LSA-C.C. Art. 3071 further provides that a compromise is a written contract. It follows that the compromise instrument is the law between the parties and must be interpreted according to the parties' true intent. Ritchey v. Azar, 383 So.2d 360, 362 (La.1980); Succession of Magnani, 450 So.2d 972, 975 (La.App. 2d Cir.1984). It also follows that the compromise instrument is governed by the same general rules of construction applicable to contracts.
LSA-C.C. Art. 2046 sets forth a general rule of construction, providing that "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LSA-C.C. Art. 2046 (emphasis supplied). The underscored word "further" in this article signifies the true nature of contractual interpretation. The determination that the language contained in a contract is clear and explicit, in itself, involves an interpretive process. For that reason, LSA-C.C. Art. 2046 emphasizes that the process involves no further interpretation, as opposed to no interpretation at all. Expose' Des Motifs of the Project of Titles III and IV of Book III of the Civil Code of Louisiana, p. 67 (1984); R. MacLean, Judicial Discretion in the Civil Law, 43 La.L.Rev. 45, 55-56 n. 28 (1982).
LSA-C.C. Art. 3073 contains a supplementary rule of construction governing the interpretation of the operative language, and the determination of the scope, of a compromise agreement. LSA-C.C. Art. 3073 provides that a compromise agreement extends only to those matters that the parties expressly intended to settle and that the scope of the transaction cannot be extended by implication. See Comment, Compromise in Louisiana, 14 Tul.L.Rev. 282, 283 (1940). More precisely, LSA-C.C. Art. 3073 set forth the following four factors to be considered in determining the scope of a compromise instrument:
[1]Transactions regulate only the differences which appear clearly to be comprehended in them by the intention of the parties,
[2] whether it be explained in a general or particular manner,
[3] unless it be the necessary consequence of what is expressed; and
[4] they do not extend to differences which the parties never intended to include in them.
We utilize these four factors below as the framework for analyzing the issue of contractual interpretation presented in the instant case.
In applying the rule of construction set forth in LSA-C.C. Art. 3073, courts are guided by the general principle "that the contract must be construed as a whole and in light of attending events and circumstances." Succession of Teddlie, 385 So.2d 902, 904 (La.App. 2d Cir.), writ refused, 393 So.2d 742 (La.1980); LSA-C.C. Art. 2050. Thus, the intent which the words of the compromise instrument express in light of the surrounding circumstances at the time of execution of the agreement is controlling.
The meaning and intent of the parties to a written instrument, including a compromise, is ordinarily determined from the four corners of the instrument, and extrinsic (parol) evidence is inadmissible either to explain or to contradict the terms of the instrument. Maltby v. Gauthier, 526 So.2d 455, 457 (La.App. 5th Cir.), writ denied, 531 So.2d 474 (La.1988); Smith v. Leger, 439 So.2d 1203 (La.App. 1st Cir.1983).[10] Louisiana courts, however, have crafted a special exception to the extrinsic evidence rule for compromise agreements based on an in pari materia reading of LSA-C.C. Art. 3073's provision that a compromise extends only to *749 those differences the parties' clearly comprehended and LSA-C.C. Art. 3079's provision that an error as to the subject matter in dispute is a ground to rescind a compromise. Moak v. American Automobile Ins. Co., 242 La. 160, 134 So.2d 911 (1961).[11]
Moak, supra stands for the proposition that when a dispute arises as to the scope of a compromise agreement, extrinsic evidence can be considered to determine exactly what differences the parties intended to settle. Following Moak, a long line of jurisprudence holds that a general release will not necessarily bar recovery for those aspects of a claim not intended by the parties to be covered by the release. Under that jurisprudential rule, the parties to a release instrument are permitted to raise a factual issue as to whether unequivocal language in the instrument was intended to be unequivocal.
Louisiana courts, however, have tempered that jurisprudential rule, recognizing that absent some substantiating evidence of mistaken intent, no reason exists to look beyond the four corners of the instrument to ascertain intent. Duet v. Lucky, 621 So.2d 168, 173 (La.App. 4th Cir.1993). Utilizing a case-by-case, factual analysis, Louisiana courts have limited the rule's application to cases in which substantiating evidence is presented establishing either (1) that the releasor was mistaken as to what he or she was signing, even though fraud was not present; or (2) that the releasor did not fully understand the nature of the rights being released or that the releasor did not intend to release certain aspects of his or her claim. Higgins v. Spencer, 531 So.2d 768, 772 (La.App. 1st Cir.), writ denied, 532 So.2d 106 (La.1988). When the factual circumstances surrounding the execution of the release instrument do not fall within either of the above categories, Louisiana courts, applying LSA-C.C. Art. 2046's general rule of construction, have not hesitated to confine their analysis to the four corners of the instrument.[12] When, as in *750 that instance, a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and thus summary judgment is appropriate. Wilson v. Cost + Plus of Vivian, Inc., 375 So.2d 683, 685 (La.App. 2d Cir.1979); Horton v. Mobley, 578 So.2d 977, 982 (La.App. 2d Cir.1991).

III.
Briefly, the parties' contentions regarding the scope of the release instrument are as follows.
Plaintiff suggests that we adopt a blanket rule that a future wrongful death claim can be released (or subject to an indemnity obligation)[13] only if the claim is specifically mentioned in the release instrument. Plaintiff contends that, in any event, the release instrument under scrutiny, by its plain terms, deals only with Buel Brown's personal injury claims and has nothing to do with the wrongful death claims asserted here. In support of this construction, Plaintiff relies on the wellsettled principle that a tort victim's personal injury claims are legally separate and distinct from his beneficiaries' wrongful death claims, citing Guidry v. Theriot, 377 So.2d 319 (La.1979).
Alternatively, Plaintiff contends that the release instrument is, at best, ambiguous as to whether the parties intended to include future wrongful death claims within its scope. In support of this contention, Plaintiff relies on three things. First, Defendants failed to include in the release instrument, which they drafted, a reference either generally to death as a potential outcome of the claimed tort, or particularly to wrongful death claims. Second, Defendants failed to obtain, and to include in the instrument, a release of the wrongful death claim of the other potential beneficiary, Kimberly Brown, the couple's minor child. And, third, Plaintiff's affidavit in which she attests to her contrary intent. Plaintiff submits that had Defendants wished to broaden the release to include wrongful death claims, it was incumbent upon them to so specify. Citing LSA-C.C. Art. 2056's general rule of construction that ambiguities in an instrument are to be construed against the drafter, Plaintiff contends that the ambiguity regarding the inclusion of wrongful death claims should have been resolved against Defendants.
In the further alternative, Plaintiff contends that the court of appeal incorrectly resolved the ambiguity regarding the scope of the release instrument on summary judgment. Citing the jurisprudential rule, discussed above, Plaintiff argues that such ambiguity must be correctly resolved on remand based on extrinsic evidence.
Conversely, Defendants contend that Plaintiff's request that this court adopt a blanket requirement of expressly mentioning in the release instrument the talismanic term wrongful death is contrary to LSA-C.C. Art. 3073's express authorization for the differences settled to be explained in a "general" manner. Defendants urge that under that article, parties are not required to give a laundry list of claims subject to a settlement. In accordance with LSA-C.C. Art. 3073's express authorization for general recitals, Defendants contend that they drafted the release instrument as broadly as possible to reflect the parties' intent that Defendants "buy their peace" as to all claims arising out of the claimed tort.
Defendants further contend that the language in the release instrument is express and unequivocal, covering any and allexisting and futureclaims, rights of action or demands relating to Buel Brown's injuries. As Ruth Brown's wrongful death action is a claim relating to Buel Brown's personal injuries, Defendants urge that it is encompassed within that all-encompassing language. Defendants contend that, contrary to Plaintiff's optimistic attestations, the language in the instrument reflects the parties' intent to settle wrongful death claims just as it does their intent to settle claims arising from any other worsening of Buel Brown's personal injuries. Defendants emphasize that Plaintiff signed *751 the broadly worded release instrument without seeking to limit the language and that she should be bound by it.
Defendants still further contend that LSA-C.C. Art. 2046's general rule of construction and the interpretive jurisprudence under it, holding that a releasor is bound by the unequivocal language of the release instrument he signed, are controlling. Defendants thus urge that the parties' subjective intent is subsumed within the written release instrument and that the court of appeal correctly declined to look beyond the four corners of the instrument in determining that the parties' intent, as reflected in the instrument, was to compromise Plaintiff's future wrongful death claim.

IV.
To place our analysis of the issue of contractual interpretation presented here in context, we begin by setting forth a basic distinction between the tort victim's personal injury action and his or her beneficiaries' wrongful death action under LSA-C.C. Art. 2315.2. Our jurisprudence, as Plaintiff correctly points out, holds that these are legally separate and distinct actions. Taylor v. Giddens, 618 So.2d 834, 840 (La.1993); Williams v. Sewerage & Water Bd. of New Orleans, 611 So.2d 1383, 1387 (La.1993); Guidry v. Theriot, 377 So.2d 319 (La.1979). Although both of these actions stem from a common tort, and thus from common factual allegations, under Louisiana law, "the rights arising in instances of this nature are not a single right of action but two separate and distinct actions." Guidry, 377 So.2d at 322. Indeed, these actions arise at different times and compensate different parties for different injuries.
The tort victim's personal injury action arises simultaneously with the claimed tortious occurrence and compensates for those injuries which are peculiar and personal to the tort victim. Guidry, supra; Knight v. Samuel, 447 So.2d 587 (La.App. 3d Cir.), writ denied, 449 So.2d 1349 (La.1984). In stark contrast, the beneficiaries' wrongful death action, by definition, comes into existence upon the tort victim's death and "serves to compensate a legislatively created class of persons for the loss occasioned by the wrongful killing of the decedent." Knight, 447 So.2d at 593-94; Daigle, 613 So.2d at 623 (citing Guidry, supra). The beneficiaries' action encompasses their damages suffered from the moment of the tort victim's death and thereafter. Taylor, 618 So.2d at 840; Guidry, 377 So.2d at 322. The beneficiaries' action compensates them for their own personal losses, both economic and emotional, suffered as a result of the tort victim's death. Williams, 611 So.2d at 1387.
In Guidry, supra, we recognized that a necessary corollary of this basis distinction is that the tort victim lacks the power to compromise the beneficiaries' potential wrongful death action because that action "never existed or arose in favor of the victim." 377 So.2d at 326. A contrary rule, we explained, would have the following effect:
If the actions are deemed but one cause of action giving rise to recovery by different individuals it would follow that in the event the victim compromised his claim and then died the wrongful death action would be lost to the beneficiary. We do not believe the legislature intended such a result.
Id. at 322.[14]
The rule in Louisiana, however, has long been established: "It was rather early recognized [in Louisiana] that the victim's compromise of his action and release of the defendant does not bar a wrongful death action by the beneficiaries against the same defendant on the same issues." H. Johnson, Death on the Callais Coach: The Mystery of Louisiana Wrongful Death and Survival Actions, 37 La.L.Rev. 1, 47 (1976); Johnson v. Sundbery, 150 So. 299 (La.App. 1st Cir.1933); *752 Gilmore v. Southern Railway Co., 229 F.Supp. 198 (E.D.La.1964); see also Guillory v. Petroleum Helicopters, Inc., 436 So.2d 1280 (La.App. 1st Cir.), writ denied, 441 So.2d 1220 (La.1983) (noting "grave doubts" as to whether indemnity agreement by tort victim was enforceable against wrongful death beneficiaries). Moreover, for almost two decades pre-Daigle, Louisiana jurisprudence heldalbeit based on a single appellate court decision incorrectly construing the codal provisions regarding contracting in future rightsthat beneficiaries, like tort victims, lacked the power to compromise their wrongful death claims before the tort victim's death. Schiffman, supra.[15] During that period, the release instrument in question was executed; hence, when the release instrument was executed, Louisiana jurisprudence was to the effect that neither the tort victim, Buel Brown, nor his beneficiaries, Ruth and Kimberly Brown, could compromise the future wrongful death claims asserted in this case.

V.
With that historical backdrop in mind, we return to the contractual interpretation issue presented in the instant case. The issue presented here is whether the language employed in the release instrument reflects that the parties clearly comprehended, in light of the surrounding circumstances, a release of future wrongful death claims.
When, as here, the parties dispute exactly what claims were clearly contemplated to be covered by a release, the jurisprudential rule allowing consideration of extrinsic evidence to determine the parties' intent would ordinarily, as Plaintiff contends, be invoked and thus dictate that we remand for consideration of such extrinsic evidence.[16] However, that jurisprudential rule is inapplicable here. While Defendants have the burden of proof, they neither suggest nor argue that summary judgment is inappropriate or that they should be given an opportunity to offer extrinsic evidence of the parties' intent. Defendants rely solely on the language of the release instrument. The instant case thus turns strictly on an interpretation of the parties' intent as reflected in the release instrument.
Utilizing the four factors set forth in LSA-C.C. Art. 3073, we find that the release instrument does not encompass future wrongful death claims.

(i) Transactions regulate only the differences which appear clearly to be comprehended in them by the intention of the parties:
The code provides that a compromise covers only those matters "clearly" contemplated by the compromise instrument. Under the code, the release instrument here can be construed as precluding Plaintiff's wrongful death action only if the parties clearly contemplated that the release would cover that future action. Neither the district court nor the court of appeal considered this contractual intent issue, relying instead on Schiffman, and Daigle, respectfully. In both of those cases, however, the release instrument expressly referred to death claims.
Turning to the wording of the release instrument here, it lacks reference either generally to death as a potential outcome of the claimed tort, as in Schiffman, or specifically to wrongful death claims, as in Daigle. In their attempt to bring Ruth Brown's wrongful death claim within its terms, Defendants thus must rely on one or more of the following general recitals in the Release Agreement:
(1) "a full release, discharge, and acquittance... of and from any and all claims, demands, causes or rights of action or suits at law or in equity of whatsoever kind of [sic] nature ... particularly on account of or relating in any way to injuries suffered by Buel Brown on or about February 9, 1979 [the date of the claimed tort]" (Paragraph 1);

*753 (2) "a full and final payment, settlement, and compromise of any and all claims, demands, causes and/or rights of action... which Buel and/or Ruth Brown ... have or may have against [Defendants] ... it being the intent hereof that Buel Brown and Ruth Brown ... grant a full and complete release and discharge in connection with the aforesaid matters ... to [Defendants]" (Paragraph 1); or
(3) "in full and final settlement and discharge of all of his legal rights ... arising out of or resulting from his injuries" (Paragraph 4).
The latter disclaimer, as pointed out in oral argument, obviously is directed solely at Buel Brown's personal injury claims and is thus inapposite. As to the former two general recitals, these, by their express terms, cover all claims arising out of Buel Brown's personal injuries. The issue before us thus can be narrowed to whether these general recitals are sufficient to clearly express the parties' intent that the release instrument cover Ruth Brown's future wrongful death claim.

(ii) Transactions can "be explained in a general or particular manner":
The code also provides that the differences settled by a compromise can be recited in a general manner. Plaintiff nonetheless contends that the strong emotional overtones inherent in the execution of anticipatory releases of wrongful death claims dictate that this court adopt a blanket express waiver requirement.[17] Conversely, Defendants contend that the adoption of such a blanket requirement would be inconsistent both with LSA-C.C. Art. 3073's express authorization of general recitals to explain the differences settled and with Daigle. Defendants contend that Daigle does not mandate the use of particular verbiage and that Daigledespite the drastic difference in verbiage between the Daigle release[18] and the release instrument hereis dispositive.
Continuing, Defendants cite as controlling the test enunciated in Daigle that "the compromise of a prospective wrongful death claim has res judicata effect if there is no error, fraud, duress or undue influence which vitiates the consent of the potential wrongful death beneficiary." 613 So.2d at 620-21. Applying that test, Defendants emphasize that no vice of consent is either alleged or present herePlaintiff was represented by counsel throughout, indeed the same counsel still represents her; Plaintiff received substantial compensation; and the release instrument was executed almost three years post-accident, and five years pre-death. It follows, Defendants contend, that Daigle's authorization of anticipatory releases of wrongful death claims, coupled with LSA-C.C. Art. 3073's authorization of general recitals of the differences settled, leads to the inescapable conclusion that the general recitals of the release instrument cover Plaintiff's wrongful death claim.
We agree with Defendants' contention that Daigle disposes of Plaintiff's argument that anticipatory releases of wrongful death actions should be treated differently than releases of other future actions, and thus decline Plaintiff's invitation to adopt an express waiver requirement. We disagree, however, with Defendants' further contention that Daigle compels a conclusion that the general recitals in the release instrument encompass Plaintiff's future wrongful death action.
Even when valid, releases of future actions are narrowly construed to assure that the parties fully understand the rights released and the resulting consequences. As a result, if the release instrument leaves any doubt as to whether a particular future action is covered by the compromise, it should be construed not to cover such future action.[19] *754 In Ritchey v. Azar, 383 So.2d 360 (La.1980), we recognized that "fail[ure] to use language in the contract which would have clearly provided for waiver of [a] future action" evidences a lack of intent to compromise such future action. Id. at 364; see also Bogalusa Community Medical Center v. Batiste, 603 So.2d 183, 188 (La.App. 1st Cir. 1992); Succession of Magnani, 450 So.2d 972, 977 (La.App. 2d Cir.1984). By the same token, Defendants' failure to use language in the release instrument which would have clearly provided for a waiver of a future wrongful death action evidences a lack of intent to compromise such future action.[20]
The underlying rationale for the special treatment accorded releases of future actions is succinctly stated as follows: "[w]herever a bargain is intended to operate in the future as an exemption from liability the courts apply more stringent rules of interpretation, partly because the chances are smaller that the parties have adverted to this very cause of action, and partly because these contracts tend to be against public policy." 15 W. Jaeger, Williston on Contracts § 1825, pp. 479-80 (3d Ed.1972).[21] While Daigle puts to rest the public policy concern raised by the release of such future actions, Daigle does not even consider the other concern of whether the parties adverted to the specific future cause of action allegedly released, which is the pivotal issue here.
That the parties probably did not advert to the wrongful death action in entering the release instrument is supported by both the facts and the state of the law at the time the agreement was executed.
Factually, nothing in the circumstances surrounding the execution of the release instrument suggests that the parties were contemplating Buel Brown's death. To the contrary, no one thought Buel Brown would die from his injuries. Plaintiff attests to this fact in her affidavit. Defendants concede this fact, noting in their brief that at the time the release instrument was executed, Buel Brown's death was not imminent. Indeed, hindsight confirms this fact; Buel Brown lived another five years after the release instrument was executed. This fact is further corroborated by the plain language of the release instrument; while Buel Brown acknowledged in the release instrument that his condition might worsen, the instrument does not mention death as a possible consequence of the claimed tort.
The state of the law at the time the release instrument was executed likewise reflects that the parties did not advert to a future wrongful death action. On September 8, 1982, the prevailing jurisprudence was that neither Buel nor Ruth Brown could compromise a future wrongful death action.[22] While this factor alone is not necessarily sufficient to establish the parties' intent, it weighs in favor of our finding that the parties did not clearly comprehend that this future action would be covered by the release instrument. Hence, the state of the law at the time the *755 release instrument was executed is relevant in that it sheds light on what the parties intended by the language employed in the instrument.
Summarizing, we find that the parties did not clearly contemplate that the release instrument would cover Ruth Brown's future wrongful death action. As established above, the factual and legal circumstances surrounding the execution of the release instrument establish that the parties did not advert to a future wrongful death action in executing the instrument. Moreover, there is no language in the instrument indicating that the parties intended to settle anything other than claims arising out of Buel Brown's personal injuries.
While on this factor, we address Defendants' related contention that under LSA-C.C. Art. 3083, an all-encompassing, general release of "all differences" between the partiesas Defendants characterize the release instrument herecovers all claims, even ones that the parties were not thinking about. See Fidelity & Deposit Co. of Maryland v. Cloy Constr. Co., 425 So.2d 887, 892 (La.App. 1st Cir.1983) (holding that LSA-C.C. Art. 3083 applies to a compromise of "all differences," and LSA-C.C. Art. 3073 applies to a compromise of limited scope).[23]
The jurisprudence construing LSA-C.C. Art. 3083 is sparse. Nonetheless, as Defendants contend, this article has been construed in a handful of cases to mean that a releasor will be bound by the unconditional language of the written release instrument he signed, despite his claims of contrary subjective intent.[24] This construction of LSA-C.C. Art. 3083 conflicts with LSA-C.C. Art. 3073's provision that compromises do not extend to differences the parties never intended to include in them. See Ingram Corp. v. J. Ray McDermott & Co., 698 F.2d 1295, 1321-22 (5th Cir.1983) (noting apparent conflict between these codal provisions).
In an attempt to resolve this apparent conflict, we retrace LSA-C.C. Art. 3083 back to its source provision. As noted elsewhere, this article is one of the obscurely worded codal provisions designed to illustrate a particular instance in which parties err. 2 M. Planiol, Treatise on the Civil Law § 2301 (La.State Law Inst.Trans.1959) ("Planiol") (discussing the source provision of this article).[25] Planiol explains that the occasion of error this article deals with is "[w]here the parties compromised in ignorance of existing titles in favor of one of them." Planiol, supra at § 2301.[26] Given that this article was intended to be illustrative of the general principles regarding rescission of compromise, we conclude that the codal scheme contemplates that when, as here, the issue is not rescission, but rather construction, of a compromise, LSA-C.C. Art. 3073 should control.
Nonetheless, there was no existing wrongful death claim at the time the release instrument was executed that was later discovered; Plaintiff's wrongful death claim did not come *756 into existence until Buel Brown's death several years later. Moreover, the release instrument, contrary to Defendants' characterization, is not one extending to all differences between the parties; instead, it is limited in two respects. One, as established above, it extends only to Buel Brown's personal injury claims. Two, it does not include a release of the other wrongful death beneficiary's claim (i.e., Kimberly Brown's claim). Regardless of the reason for Defendants' failure to obtain a release from the other beneficiary, the absence of such party from the release instrument undercuts Defendants' characterization of the release instrument as one settling all differences between the parties. Moreover, not only does the release instrument not purport to end all differences between the parties, but also by including the indemnity provision, discussed below, it substitutes one dispute for another. See Rivett, supra. Defendants' reliance on LSA-C.C. Art. 3083 is thus misplaced.

(iii) "The necessary consequence of what is expressed" qualification:
In a further attempt to bring Ruth Brown's wrongful death claim within the ambit of the release instrument, Defendants rely on LSA-C.C. Art. 3073's qualification that even claims not intended to be included in a compromise are nonetheless included if they are a "necessary consequence of what is expressed." Defendants argue that regardless of whether Ruth Brown intended to compromise her wrongful death claim, the release instrument must cover such claim because death was a necessary consequence of Buel Brown's personal injuries, and thus the clear language of LSA-C.C. Art. 3073 renders Ruth Brown's subjective intent to the contrary inconsequential. Plaintiff counters that death is not a necessary consequence of personal injuries.
The jurisprudence interpreting the "necessary consequence" provision of LSA-C.C. Art. 3073 is scant. Nonetheless, from that jurisprudence emerges the following two principles. First, this provision qualifies the general rule that the parties' actual intent is relevant in determining the scope of a compromise. Ravia v. Istre, 600 So.2d 812, 814 (La.App. 3d Cir.1992); Ingram Corp. v. J. Ray McDermott & Co., 698 F.2d 1295, 1321 (5th Cir.1983). Second, "[a]ll necessary consequences of what is expressed in the [a]greement, must be reflected within the four corners of the instrument." Pat O'Brien's Bar, Inc. v. Franco's Cocktail Products, Inc., 615 So.2d 429, 432 (La.App. 4th Cir.), writ denied, 617 So.2d 909 (La. 1993).
Applying those principles to the instant case, we find Defendants' reliance on this qualification misplaced. The release instrument, by its express terms, covers only claims arising out of Buel Brown's personal injuries. The wrongful death claim in question is not a necessary consequence of Buel Brown's personal injurieslogically, legally or factually. Logically, as Plaintiff contends, it cannot be said that a necessary consequence of personal injury is death. Legally, as outlined above, claims arising out of a tort victim's personal injuries are separate and distinct from his beneficiaries' wrongful death claim. And, factually, as discussed above, at the time the release instrument was executed, no one thought that Buel Brown would die as a result of his injuries from the accident in question.
A more basic deficiency in Defendants' argument that the wrongful death action is a necessary consequence of what is expressed in the release instrument is that it would require we read into the instrument, which states that it covers all claims arising out of Buel Brown's personal injuries, a statement that it covers all claims arising out of the claimed tort. The latter verbiage, unlike the actual verbiage in the release instrument, has been construed in other states as clearly evidencing an intent to compromise all claims arising from a common tort, including both the tort victim's personal injury action and the beneficiaries' subsequently arising wrongful death action. F.W. Woolworth Co. v. Todd, 204 Okla. 532, 231 P.2d 681 (1951).[27] *757 The "necessary consequence" qualification, however, extends only to matters expressed within the four corners of the instrument. Pat O'Brien's, supra.

(iv) Transactions do not extend to differences which the parties never intended to include in them:
Defendants' final attempt to bring the wrongful death claim within the scope of the differences the parties intended to settle is based on the fact that the only claim Ruth Brown had at the time the release instrument was executed was her wrongful death action. From this premise, Defendants urge that if this future action was not intended to be included within the scope of the release, then Ruth Brown's execution of the instrument would have been a meaningless gesture. We disagree. Defendants overlook the fact that at the time the release instrument was executed, Ruth Brown was a party plaintiff to the pending suit, asserting a claim for loss of consortium, albeit before such claim was legislatively authorized.[28]
This final factor reiterates the important role the intent of the parties plays in determining the scope of compromise agreements in Louisiana; differences which the parties do not intend to settle are unaffected by a compromise agreement. Matthew v. Melton Truck Lines, Inc., 310 So.2d 691, 693 (La.App. 1st Cir.1975). Applying that factor here, we find the release instrument does not extend to Ruth Brown's future, uncontemplated wrongful death action, an action entirely separate and apart from Buel Brown's action for his personal injuries and Ruth Brown's claim for loss of consortium. In so finding, we are not unmindful of the strong policy favoring compromise agreements and finality of settlements. Rivett v. State Farm Fire and Casualty Co., 508 So.2d 1356 (La.1987); Succession of Teddlie, 385 So.2d 902, 904 (La.App. 2d Cir.), writ refused, 393 So.2d 742 (La.1980). The policy favoring compromise agreements, however, cannot defeat the statutorily created rights in favor of survivors of tort victims wrongfully killed. In any event, our holding here, together with our holding in Daigle, permits defendants to conclusively compromise potential wrongful death claims, provided the intent to do so is unequivocally reflected, while not necessarily by express mention of such claims, in the language employed in the release instrument. The release instrument here does not do so.

VI.
Since we rule in Plaintiff's favor regarding the interpretation of the release provisions, we must next address the parties' contentions regarding the indemnity provision of that same instrument. Generally, the indemnity provision provides that Buel and Ruth Brown will hold harmless, indemnify and defend Defendants in the event that there be any further claims arising out of Buel Brown's personal injuries by anyone, expressly including his heirs. Defendants submit that Kimberly Brown's wrongful death claim falls squarely within that provision. Defendants further submit that a greater amount was paid in settlement than otherwise would have been paid solely because of the inclusion of that indemnity obligation. To allow Plaintiff to avoid the indemnity obligation for which she was compensated, Defendants urge, would result in her being unjustly enriched. Plaintiff counters that Defendants should not be able to accomplish through the back door via the indemnity provision a release of the minor's wrongful death claim when they could not have accomplished that same result directly without taking the additional step of obtaining court approval.[29]
*758 As with compromise agreements, the general rules governing the interpretation of contracts apply in construing indemnity agreements. Soverign Ins. Co. v. Texas Pipe Line Co., 488 So.2d 982, 984 (La.1986). One such general rule is that the agreement must be construed as a whole and that terms employed in several places in the agreement must be construed as a whole and that terms employed in several places in the agreement must be construed as having the same meaning throughout. LSA-C.C. Art. 2050.[30] Applying this general rule, we conclude that since future wrongful death claims were neither contemplated nor included in the release provisions, such claims likewise were neither contemplated nor included in the indemnity provision of that same instrument. Simply put, the indemnity provision, like the release provisions, is limited to claims for any and all of Buel Brown's personal injuries.
Our finding renders it unnecessary to address Plaintiff's counter argument regarding Defendants' attempted use of the indemnity provision as a backdoor method of obtaining a release of the minor child's claim. Nonetheless, we note that in jurisdictions, like Louisiana, that have adopted statutory procedures for obtaining minor settlements, defendants should not be permitted to bypass such procedures by the simple expedient of including an indemnity provision in a release instrument executed by the minor's parent.[31]
As to Defendants' argument regarding unjust enrichment, we note that both the courts and commentators have recognized the potential double recovery problem presented in cases like this one. When, as here, the tort victim during his lifetime is compensated, either by judgment or settlement, and after his death his heirs are permitted to pursue wrongful death claims, the potential double recovery problem arises. This problem stems from the overlap between the elements of damages recovered by the tort victim in the earlier action or settlement, and the elements of damages claimed by the beneficiary in the wrongful death action. The solution to this problem, as Defendants acknowledge by asserting the affirmative defense of set-off, is to allow, if warranted, some type of credit.[32] On remand, the trial court can consider the potential for double recovery and tailor any judgment rendered accordingly.

VII.
For the foregoing reasons, we conclude, as a matter of law, that the release instrument was not intended to cover the wrongful death actions asserted by Ruth Brown and Kimberly Brown. We thus reverse the judgment of the court of appeal dismissing Ruth Brown's wrongful death action based on the release instrument; overrule Defendants' motion for summary judgment on their third party demand against Ruth Brown based on the indemnity provision of that instrument; and remand to the district court for further proceedings.
REVERSED AND REMANDED.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, Ortique, J., was not on the panel which heard and decided this case. See footnote in State v. Barras, 615 So.2d 285 (La.1993).
[1] At that time, however, loss of consortium damages were neither jurisprudentially nor statutorily recognized. A right to claim damages for loss of consortium was not recognized until a 1982 amendment to LSA-C.C. Art. 2315, and that amendment was not applied retroactively. Abadie v. Commercial Union Ins. Co., 464 So.2d 979 (La.App. 4th Cir.1985); Ferguson v. Burkett, 454 So.2d 413 (La.App. 3d Cir.1984).
[2] The Settlement Agreement expressly recites that the purpose of the annuity was to provide for the minor child of Buel and Ruth Brown, Kimberly Brown; specifically, the agreement recites:

Defendant shall purchase an annuity payable to Kimberly Lynn Brown ... Such payment is made to Kimberly Brown as an attempt to compensate her for damages sustained as a result of being deprived of nurture, guidance and companionship of a healthy father ...
[3] The Release Agreement also refers to other parties who were named as defendants, but not served, and it contains a reservation of rights involving some of those unserved parties. However, neither those other parties, nor the reservation of rights is pertinent to the instant case.
[4] The court of appeal, finding no error, denied writs as to that part of Defendants' motion for summary judgment relating to the claim asserted on behalf of the couple's minor child, Kimberly Brown. While the minor's claim is thus not directly before us, we address it indirectly below in connection with the parties' rights under the indemnity provision of the Release Agreement. Defendants concede that the minor's claim was not settled; however, they contend that under the indemnity provision, plaintiff must repay them for any amounts awarded on the minor's claim. In this regard, the record reflects that Kimberly Brown is now a major and has been substituted as a proper party plaintiff, and that Buel Brown had another child of a former marriage who could also be a potential beneficiary under LSA-C.C. Art. 2315.2.
[5] The Release Agreement was incorporated by reference into the Settlement Agreement, which Buel and Ruth Brown's attorney entered into on their behalf. Before this court, Ruth Brown stresses the fact that she and her husband signed only the Release Agreement, and raises an issue of whether the Release Agreement subsumed the Settlement Agreement. We find it unnecessary to decide that issue for two reasons. One, a release of a claim executed in exchange for consideration received is, in effect, a compromise which can form the basis for a plea of res judicata. Sauerwin v. State Farm Mutual Automobile Ins. Co., 490 So.2d 449, 451 (La.App. 5th Cir. 1986); Matthew v. Melton Truck Lines, Inc., 310 So.2d 691 (La.App. 1st Cir.1975). Two, we base our decision on the language in the Release Agreement and the circumstances surrounding its execution.
[6] Under the Civil Code, the terms transaction and compromise are synonymous. Audubon Ins. Co. v. Farr, 453 So.2d 232, 234 n. 2 (La.1984) (citing Hill v. Hill, 173 La. 574, 138 So. 107 (1931)); Aetna Casualty & Surety Co. v. Landry, 578 So.2d 537, 539 (La.App. 3d Cir.1991) (same).
[7] The proper procedural mechanism for interposing the defense of transaction or compromise is the peremptory exception of res judicata. Rivett v. State Farm Fire and Casualty Co., 508 So.2d 1356 (La.1987); Murphy v. Hoffpauir, 540 So.2d 573 (La.App. 3d Cir.1989). Nonetheless, a motion for summary judgment can be granted based on a finding of res judicata when there is no genuine issue as to any material fact. R.G. Claitor's Realty v. Juban, 391 So.2d 394, 403 (La. 1980) (on rehearing). Defendants' use of a motion for summary judgment based on the release instrument was thus procedurally proper. Moreover, as noted above, Defendants initially interposed the release by properly asserting it as an affirmative defense. LSA-C.C.P. Art. 1005 (defining a compromise or transaction as an affirmative defense).
[8] The elements of a compromise are two-fold: (1) mutual intention of putting an end to the litigation, and (2) reciprocal concessions of the parties in adjustment of their differences. First Nat'l Bank of Jefferson Parish v. Manor Heights Co., 576 So.2d 61, 64 (La.App. 5th Cir.), writ denied, 577 So.2d 35 (La.1991) (citing Rivett, supra).
[9] The grounds for rescinding a compromise are set forth in LSA-C.C. Arts. 3078 through 3083. Taken together, LSA-C.C. Arts. 3078 and 3079 provide that rescission of compromise is justified in three cases: (1) error in the person, (2) error on the matter in dispute, and (3) fraud or violence. Halford v. Dugas, 422 So.2d 693, 694 (La.App. 3d Cir.1982); Matthew v. Melton Truck Lines, Inc., 310 So.2d 691, 692 (La.App. 1st Cir.1975). Particular applications of the general rules pertaining to rescinding a compromise are set forth in LSA-C.C. Arts. 3080 through 3083, each pointing out a particular occasion when parties err; these articles, however, are couched in very obscure terms. 2 M. Planiol, Treatise on the Civil Law §§ 2286, 2299 and 2301 (La.State Law Inst.Trans.1959) ("Planiol") (discussing the source provisions of these articles). As discussed elsewhere, this codal scheme undercuts Defendants' reliance on LSA-C.C. Art. 3083 as dispositive of the contractual interpretation issue presented here.
[10] The general rule applicable to contracts is that extrinsic evidence is admissible only "when the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed." Dixie Campers, Inc. v. Vesely Co., 398 So.2d 1087, 1089 (La.1981); see also Leenerts Farms, Inc. v. Rogers, 421 So.2d 216, 218 (La.1982).
[11] Moak v. American Automobile Ins. Co., 242 La. 160, 134 So.2d 911 (1961); Pat O'Brien's Bar, Inc. v. Franco's Cocktail Products, Inc., 615 So.2d 429, 432 (La.App. 4th Cir.), writ denied, 617 So.2d 909 (La.1993); Tolis v. Board of Supervisors of Louisiana State University, 602 So.2d 99, 102-103 (La.App. 4th Cir.1992) (summarizing exceptions to parol evidence rule for compromise agreements); Clark v. Ark-La-Tex Auction, Inc., 593 So.2d 870, 881-82 (La.App. 2d Cir.), writ denied, 596 So.2d 210 (La.1992) (parol evidence properly considered when agreement alone is far from clear); Bogalusa Community Medical Center v. Batiste, 603 So.2d 183, 188 (La.App. 1st Cir.1992); Tarver v. Oliver H. Van Horn Co., 591 So.2d 1366, 1369 (La.App. 4th Cir.1991), writ denied, 594 So.2d 891 (La.1992); Aldredge v. Whitney, 591 So.2d 1201, 1202 (La. App. 2d Cir.1991); Succession of Morvant, 578 So.2d 549, 554-55 (La.App. 3d Cir.1991) (noting that rule regarding parol evidence is liberally construed with regard to compromise agreements); Sanders v. Collins, 551 So.2d 644, 648 (La.App. 1st Cir.1989), writ denied, 556 So.2d 1261 (La.1990) (finding trial court erred in declining to admit parol evidence); Ellison v. Michelli, 513 So.2d 336, 338 (La.App. 4th Cir. 1987); Thompson v. Bank of New Orleans and Trust Co., 422 So.2d 230, 231-32 (La.App. 4th Cir.1982); Munna v. Mangano, 404 So.2d 1008, 1010 (La.App. 4th Cir.1981); Henderson v. Stansbury, 372 So.2d 1253 (La.App. 3d Cir.1979); Matthew v. Melton Truck Lines, Inc., 310 So.2d 691, 693 (La.App. 1st Cir.1975); Mooneyhan v. State Farm Mutual Automobile Ins. Co., 290 So.2d 405 (La.App. 2d Cir.1974); Webb v. Sonnier, 272 So.2d 778, 780-81 (La.App. 3d Cir.1973); Volkswagen Ins. Co. v. Bishop, 231 So.2d 465 (La.App. 2d Cir.1970); LeBlanc v. Brou, 205 So.2d 141, 143 (La.App. 1st Cir.1967), writ denied, 251 La. 749, 206 So.2d 95 (1968); American Metal Window Co. v. St. Tammany Parish School Bd., 183 So.2d 667, 669 (La.App. 1st Cir.1966).
[12] Duet v. Lucky, 621 So.2d 168, 173 (La.App. 4th Cir.1993) (noting that absent evidence substantiating alleged mistake in intent, no reason exists to look beyond four corners of document); Brown v. Simoneaux, 593 So.2d 939, 941 (La. App. 4th Cir.1992) (noting that "the language of the release is so broad and unambiguous it leaves little to be misunderstood"); Barnhill v. Consolidated Medical, Disability & Life Trust, 569 So.2d 1115, 1117 (La.App. 3d Cir.1990), writ denied, 572 So.2d 93 (La.1991) (finding language of release so broad as to clearly cover liability sued upon); Shepherd v. Allstate Ins. Co., 562 So.2d 1099, 1102 (La.App. 4th Cir.1990) (holding unambiguous release executed by literate, intelligent party could not be nullified absent vice of consent); Watkins v. Johns-Manville Corp., 458 So.2d 212, 215-16 (La.App. 5th Cir.1984) (plain and unambiguous agreement is properly construed based solely on language of document); Succession of Teddlie, 385 So.2d 902, 905 (La. App. 2d Cir.), writ refused, 393 So.2d 742 (La. 1980); see also National Union Fire Ins. Co. of Pittsburgh, Pa. v. Circle, Inc., 915 F.2d 986, 990 (5th Cir.1990); Ingram Corp. v. J. Ray McDermott & Co., 698 F.2d 1295, 1312 (5th Cir.1983) (noting that Louisiana courts have declined to admit parol evidence when the release is complete on its face and collecting cases).
[13] While the lower courts failed to address the issue of the indemnity provision of the release instrument, both sides submit that the arguments outlined below regarding the release provisions apply to the indemnity provision.
[14] Such a result, however, is the majority rule in the United States. Under the majority rule, wrongful death statutes are construed to mean that a tort victim's compromise or release of his injuries during his lifetime bars any subsequent suit by his beneficiaries for wrongful death. 2 S. Speiser, C. Krause and J. Madole, Recovery for Wrongful Death and Injury, § 5:14, p. 48 n. 22 (3d Ed.1992) (noting that majority rule is a "contradiction in terms"); W. Keeton, Prosser and Keeton on Torts § 127, pp. 955-56 n. 22 (5th Ed.1984) (noting that majority rule undoubtedly is premised, at least in part, on policy of precluding potential double recovery).
[15] We note that on September 10, 1982two days after the Release Agreement was executed the legislature enacted a temporary remedial measure, LSA-R.S. 9:3921, which authorized the pre-death waiver of wrongful death claims with court approval. However, that enactment, by its own terms, lapsed in 1983, and thus is inapposite here.
[16] See cases collected in Note 11, supra.
[17] Plaintiff alternatively contends that the general recitals are, at best, ambiguous and that extrinsic evidence should thus be considered to determine the parties' intent. As noted elsewhere, we find it unnecessary to remand for consideration of such extrinsic evidence.
[18] The release in Daigle, unlike the release under scrutiny here, expressly mentioned wrongful death claims, providing that "[beneficiary-wife] does hereby release ... all claims which she may have now or at any time in the future for the alleged wrongful death of Daniel Daigle." 613 So.2d at 621.
[19] Comment, Release of Personal Injury Claims in Louisiana, 17 Loy.L.Rev. 395, 397 (1971); H. Havighurst, Problems Concerning Settlement Agreements, 53 N.W.U.L.Rev. 283, 289 (1958) (noting that even when valid, releases of future claims are narrowly construed); see also H. Havighurst, Principles of Construction and The Parol Evidence Rule as Applied to Releases, 60 N.W.U.L.Rev. 599, 616-17 n. 70 (1965).
[20] In this regard, we note, as plaintiff suggests, the applicability of LSA-C.C. Art. 2056's general rule of construction, requiring that any unresolved doubt about the meaning of a contract be eliminated by interpreting the contract against its drafterhere, Defendants. See National Union Fire Ins. Co. of Pittsburgh, Pa. v. Circle, Inc., 915 F.2d 986, 990 (5th Cir.1990). Applying this rule in contexts like this one is appropriate in that it recognizes the reality that the releasee is responsible for the broad release language and that any ambiguity should thus be construed against the releasee.
[21] See also Rensink v. Wallenfang, 8 Wis.2d 206, 99 N.W.2d 196, 200 (1959) (quoting 76 C.J.S. Release § 53) (demands accruing subsequent to the execution of a release generally are not discharged unless "expressly embraced therein or falling within the fair import of the terms employed").
[22] Defendants contend that Ruth Brown's argument that she should be able to rely on the state of the law as it existed when the agreement was executed is simply an attempt to rescind a compromise based on an error of law which LSA-C.C. 3078 prohibits. This argument is unavailing because the issue here is not rescission of a compromise, but rather whether a compromise of the wrongful death action was ever confected.
[23] LSA-C.C. Art. 3083 provides:

When parties have compromised generally on all the differences, which they might have had with one another, the titles which they then know nothing of and which were afterwards discovered, are not a cause of rescinding the transaction, unless they have been kept concealed on purpose by the deed of the parties. But the transaction becomes void, if it relates only to an object upon which it is provided by the titles newly discovered, that one of the parties has no right at all.
[24] Hicks v. Fidelity-Southern Fire Ins. Co., 251 So.2d 526 (La.App. 1st Cir.1971) (finding plaintiff's claim that he was unaware of full extent of loss at time signed release insufficient to invalidate general release of all claims arising out of particular event, Hurricane Betsy); Jurado v. State Farm Mutual Ins. Co., 557 So.2d 266, 268 (La.App. 4th Cir.1990) (holding that release cannot be rescinded simply because plaintiff later learns she had a more serious injury); see also Ingram, 698 F.2d at 1322 (noting that "Louisiana cases hold that an unknown claim is not ample ground to avoid the terms of a release").
[25] See discussion in Note 9, supra.
[26] Planiol more fully explains this article as following:

The law distinguishes: the compromise may be annulled if it involves a single object, and titles subsequently discovered come to demonstrate that one of them did not have any right; it is otherwise if the object of the compromise was general and involved all the questions outstanding between them. However, even in the last case, the demand in nullity is receivable if the titles were fraudulently withheld by one of the parties.
Planiol, supra at § 2301.
[27] See Cannon v. Pearson, 383 S.W.2d 565, 568-69 (Tex.1964) (differentiating general release language covering all claims "growing out of the accident" from language covering only all claims for damages arising out of personal injuries, noting that the former is sufficient to encompass both wrongful death and personal injury claims, but the latter is limited to personal injury claims); see also Note, Avoidance of a Release for Personal Injuries on the Ground of Mutual Mistake of Fact as to the Extent or Nature of the Injuries, 19 U.Pitt.L.Rev. 111, 119 (1957) (suggesting that general release be worded as a settlement of "all claims growing out of the accident").
[28] See discussion in Note 1, supra.
[29] In this regard, Plaintiff also cites LSA-R.S. 9:3921. As pointed out in Note 15, supra, that temporary remedial measure is inapposite here.
[30] LSA-C.C. Art. 2050 provides that "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."
[31] For an extensive discussion of the problems raised by such releases, labelled "Parents' Indemnifying Releases," see generally D. Dobbs, Conclusiveness of Personal Injury Settlements: Basic Problems, 41 N.C.L.Rev. 665, 673-74 (1963). This commentator notes that if a statute contemplates court approval of minor settlements, a settlement in any other manner is void. This commentator further notes that "[c]ourts that have reached the problem [presented by such Parents' Indemnifying Releases] have said that such an indemnity provision is a backdoor way of holding a minor to his release, and have ruled that such releases violate public policy and are invalid." Id. at 673.
[32] Schiffman, 308 So.2d at 830 (Lemmon, J., concurring in denial of rehearing); see also J. Fleming, The Lost Years: A Problem in the Computation and Distribution of Damages, 50 Cal. L.Rev. 598 (1962) (extensively analyzing the double recovery problem); Alfone v. Sarno, 87 N.J. 99, 432 A.2d 857, 865-70 (1981).